# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## NORFOLK DIVISION

AIMEE MARIE JENKINS-GRIFFIN,
Administrator of the Estate of CHRISTOPHER
GEORGE GRIFFIN, Deceased,

                Plaintiff,

    v.

3M Company, et al.,

                Defendants.

Case No. 2:24-cv-600

## NOTICE OF REMOVAL

PLEASE TAKE NOTICE that, pursuant to 28 U.S.C. § 1442(a)(1), Defendant Globe Manufacturing Company, LLC ("Globe"), by counsel, files this Notice of Removal from the Circuit Court for the City of Norfolk to the United States District Court for the Eastern District of Virginia, Norfolk Division. As grounds for removal, Globe states as follows:

## PRELIMINARY STATEMENT

1.    Plaintiff's case belongs in federal court pursuant to federal officer jurisdiction under 28 U.S.C. § 1442(a)(1).

2.    The Complaint alleges that Globe is a manufacturer of PFAS[1]-containing firefighter turnout gear[2] and alleges that Decedent was exposed to PFAS-containing firefighter turnout gear

---

[1] PFAS is per- and polyfluoroalkyl substances. PFAS is a family of several thousand synthetic chemicals that are used in a multitude of products to provide water, heat, and oil resistance. Plaintiffs define PFAS as "chemicals consisting of a chain of carbon and fluorine atoms," which may include "'long-chain' PFAS made up of seven or more carbon atoms," and "'short-chain' PFAS made up of six or fewer carbon atoms." *See* Compl. at ¶ 3.

[2] Turnout gear is protective clothing worn by firefighters to defend against heat, flames, steam burns, and other dangers.

in the course of his work.

3.     Upon information and belief, the City of Norfolk contracted with a Globe distributor to purchase built-to-order Globe turnout gear for Decedent in 2019. However, Plaintiff does not allege which brand of turnout gear that the City of Norfolk procured for Decedent or whether Decedent ever wore Globe turnout gear. If Decedent did not wear Globe turnout gear, then there is no good faith basis for this lawsuit and Globe must be dismissed.

4.     Based on the four corners of the Complaint, it appears that Plaintiff is implying that Globe is a manufacturer of turnout gear alleged to have caused harm to Decedent, and on that basis and for the reasons set forth more fully below, Globe is entitled to assert federal officer jurisdiction until it is dismissed.

5.     As detailed below, **Globe was acting under a federal officer and in conformance with federal specifications when it manufactured the product at issue.** Globe has a colorable government contractor defense that must be heard in federal court.  Therefore, removal is proper under the federal officer removal statute, 28 U.S.C. § 1442(a)(1).

6.     Promptly after removal, Defendant 3M intends to request that the Judicial Panel on Multidistrict Litigation ("JPML") transfer this action to a multidistrict litigation pending in the District of South Carolina (the "AFFF MDL" or "MDL").  All defendants support the request to transfer this action to the AFFF MDL.

7.     The AFFF MDL encompasses many cases like this one, in which plaintiffs assert claims based on firefighter exposure to PFAS in firefighting foam[3] and firefighter turnout gear. *See, e.g.*, Compl. ¶¶ 6-10, 173, 182 (alleging harm arising from Decedent's alleged exposure to

---

[3] PFAS-containing Class B firefighting foam is also known as aqueous film-forming foam ("AFFF").

PFAS in turnout gear and alleging that "Defendants knew or should have known that . . . selling Class B foam and/or turnouts containing PFAS… would result in harm to Decedent").[4]

## BACKGROUND

8.      Plaintiff filed this action in the Circuit Court for the City of Norfolk on September 29, 2023. *See* Compl. Globe was served on September 16, 2024.  This case is timely removed under 28 U.S.C. § 1446(b)(1).[5]

9.       Venue is proper in this Court pursuant to 28 U.S.C. §§ 127 and 1441(a) because the Circuit Court for the City of Norfolk is located within the Eastern District of Virginia, Norfolk Division.

10.     Pursuant to 28 U.S.C. § 1446(a) and the Attorney Civil Case Opening Procedures of the United States District Court of the Eastern District of Virginia, true and accurate copies of the state court pleadings are attached hereto as Exhibit A.

11.     Pursuant to 28 U.S.C. § 1446(d), Removing Defendant is serving a copy of this Notice of Removal upon all other parties to this case and are filing a copy with the Clerk of the Circuit Court for the City of Norfolk.

---

[4] The JPML created the AFFF MDL in 2018 for claims seeking to recover for PFAS in groundwater and drinking water from firefighting foam, and, in 2021, expanded the scope of the MDL to include claims alleging exposure to PFAS in firefighting foam and turnout gear. *In re AFFF Prods. Liab. Litig.*, 357 F. Supp. 3d 1391, 1392 (JPML 2018); *In re AFFF Prods. Liab. Litig.*, No. 2873, 2021 WL 755083, at *1-2 (JPML Feb. 4, 2021) (transferring cases brought by "firefighters who were exposed to [PFAS] through the use of aqueous film-forming foams (AFFFs), which are used to extinguish fires, and by wearing certain protective clothing and gear that allegedly contained PFAS").

[5] Unlike cases removed based on diversity jurisdiction under 28 U.S.C. § 1332, cases that are removed based on federal officer jurisdiction under 28 U.S.C. § 1442(a)(1) are not subject to the one-year removal deadline set forth in 28 U.S.C. § 1446(c)(1). *See also, e.g., O'Quinn v. CNH Am., LLC*, 457 F. Supp. 2d 678, 682 (E.D. Va. 2006) (holding that the one-year limitation on removal applies *only* where removal is based on diversity); *US Airways, Inc. v. PMA Cap. Ins. Co.*, 340 F. Supp. 2d 699, 704 (E.D. Va. 2004) (same).

12.     Plaintiff alleges that Decedent, during his career as a firefighter, was exposed to PFAS in two types of firefighting products: turnout gear and Class B foam, which Plaintiff alleges resulted in Decedent's glioblastoma and eventual death on October 1, 2021. *See* Compl. ¶¶ 8, 11, 173, 179, 182.

**Globe Manufacturing Company**

13.     Globe has been in the business of making firefighter turnout gear for over 130 years.

14.     Globe does not manufacture PFAS or add PFAS directly to its products.

15.     Globe builds what is known in the industry as "structural" turnout gear, which is designed to provide protection against burn injuries and other hazards over a wide range of conditions while minimizing heat stress to the firefighter.

16.     Globe is a cut-and-stitch manufacturer, and builds its turnout gear from technical fabrics that are sourced from the same textile manufacturers that, on information and belief, supply all U.S. structural turnout gear providers.  These protective fabrics have been tested and certified to meet industry standards, and some of them, as supplied to Globe, contain or historically have contained PFAS to achieve performance characteristics such as water, oil, or chemical resistance.

17.     Each garment of Globe turnout gear is built-to-order for the firefighter who will wear it. Globe primarily sells its gear through distributors, which often contract with government entities. Globe also sells its products to government entities directly.

18.     Globe has contracted directly with the federal government on multiple occasions for sales of turnout gear, including contracts in which the federal government specified turnout gear compliant with standards promulgated by the National Fire Protection Association ("NFPA"). Globe has an active registration with the U.S. System for Award Management, which allows entities to register to do business with the federal government. The federal government has

classified Globe as a "Cut and Sew Apparel Contractor."

19.     Upon information and belief, the City of Norfolk contracted with a Globe distributor, pursuant to a federal contract, to purchase built-to-order Globe turnout gear for Decedent in 2019.

**The National Fire Protection Association (NFPA) Standard 1971**

20.     The NFPA is a nonprofit organization that promulgates safety codes and standards for fire, electrical, and building safety. *About Us*, NAT'L FIRE PROT. ASS'N, https://www.nfpa.org/About-NFPA (last visited Sept. 26, 2024). NFPA 1971, which establishes performance standards for structural turnout gear, was created and voted for by a Technical Committee composed of representatives with special expertise from industry, firefighting, and the federal government. NAT'L FIRE PROT. ASS'N, NFPA 1971, STANDARD ON PROTECTIVE ENSEMBLES FOR STRUCTURAL FIRE FIGHTING AND PROXIMITY FIRE FIGHTING (ed. 2007). Specifically, the 2007 Technical Committee, which voted in favor of the 2007 edition of NFPA 1971, included a representative from the federal government, Harry P. Winer of the U.S. Department of the Navy. *Id.*

21.     The NFPA 1971 Standard for Protective Ensembles for Structural Fire Fighting and Proximity Fire Fighting has been revised from time to time since 2007.  The currently applicable version of NFPA 1971 is the NFPA Standard for Protective Ensembles for Structural Fire Fighting and Proximity Fire Fighting, 2018 Edition.

22.     Upon information and belief, all NFPA 1971-compliant gear available for sale in 2019—the year, upon information and belief, the City of Norfolk purchased Globe turnout gear—was made with textiles that contained some form of PFAS, including one or more components containing a type of PFAS called PTFE, or polytetrafluoroethylene, commonly known as

Teflon$^{\text{TM}}$.

23.    PTFE is a fluoropolymer and is commonly included in definitions of PFAS.

24.    The federal government has recognized that compliance with NFPA 1971 required the use of PFAS during the relevant period.

     a.    The Department of Homeland Security ("DHS") and the Federal Emergency Management Agency ("FEMA"), in 2022, acknowledged that "no manufacturers currently produce PPE (i.e., pants, coats) that are fully PFAS free . . . ." *See* DHS, Notice of Funding Opportunity, Fiscal Year 2022 Assistance to Firefighters Grant Program at 52 (2022), https://www.fema.gov/sites/default/files/documents/fema_fy-22-afg-nofo.pdf ("2022 NOFO").

     b.    The U.S. Fire Administration, which is a part of FEMA, states on its website that "[t]he properties of PFAS can impart water and oil resistance to fabrics so they are often used to help firefighter gear meet the safety standards of [NFPA 1971] criteria for resistance to heat, water and other hazards." *See New Information on Potential Carcinogens in Firefighter Gear*, U.S. FIRE ADMIN.: BLOG (May 11, 2023), https://www.usfa.fema.gov/blog/carcinogens-in-firefighter-gear/.

     c.    The National Institute of Standards and Technology, a part of the U.S. Department of Commerce, has stated:  "To meet the performance requirements specified in NFPA 1971 for chemical, light, and water resistance, certain layers of turnout gear are commonly treated with fluorinated polymers or include fluoropolymer membranes."  *See* NIST Technical Note 2260, available at https://nvlpubs.nist.gov/nistpubs/TechnicalNotes/NIST.TN.2260.pdf (last visited

10/3/2024).

25.     In 2021, the NFPA Technical Committee voted against a proposed Temporary Interim Amendment to the NFPA 1971 standard. One of the members that voted against the revision was a representative of the federal government, Anthony D. Putorti, Jr. of NIST, who noted that, while the current standard "may be overly restrictive" for limiting moisture barriers[6] to PFAS-containing materials, he felt it was necessary "due to the acute fire fighter exposure hazards associated with moisture barrier failure." Memorandum from Yvonne Smith, NFPA Comm. Adm'r, to Tech. Comm. on Structural and Proximity Fire Fighting Prot. Clothing and Equip., Nat'l Fire Prot. Ass'n at 14 (July 6, 2021), available at https://peer.org/wp-content/uploads/2021/07/7_13_21-NFPA-1971_TIA_vote.pdf.

26.     Thus, as acknowledged by the federal government, **any federal specifications requiring compliance with NFPA 1971 required the use of PFAS** during the relevant period.

## The Federal Assistance to Firefighters Grant Program

27.     The Department of Homeland Security ("DHS") and the Federal Emergency Management Agency ("FEMA") administer the Assistance to Firefighters Grant Program ("AFG Program"). *See* Federal Emergency Management Agency, Assistance to Firefighters Grants Program (2024), https://www.fema.gov/grants/preparedness/firefighters. The AFG Program provides financial assistance to fire departments for the purchase of "critical training and equipment," including turnout gear, in order to "support[] the goal to Strengthen National Preparedness and Resilience." DHS, Notice of Funding Opportunity, Fiscal Year 2019 Assistance to Firefighters Grant Program at 2 (2019), https://www.fema.gov/sites/default/files/2020-

---

[6] Turnout gear coats and pants are comprised of three layers—an outer shell, moisture barrier, and thermal liner.

07/FY19AFGNOFINAL.pdf ("2019 NOFO").

28.     The AFG Program permits "[o]nly the acquisition of PPE compliant with the most current edition of NFPA 1971." *See* 2019 NOFO at 43. One of the "[p]erformance metrics" of the AFG Program is to equip firefighters "with PPE in compliance with applicable NFPA and OSHA standards." *Id.* at 3. OSHA also requires that firefighter personal protective equipment "be at least equivalent to the requirements of [NFPA 1971]." *See* 29 C.F.R. § 1910.156(e)(3)(ii).

29.     Within the AFG Program guidelines, **DHS plainly refers to grant recipients as "do[ing] business with the federal government."** *See* 2019 NOFO at 1.

30.     DHS refers to the recipients of the end-funding of the AFG as "contractor[s]" and requires that they are not "suspended or debarred from participating in specified federal procurement or non-procurement transactions." *Id.* at 59.

31.     DHS outlines numerous rules for dealing with "contractors or parties to subcontracts." *Id.* at 64. DHS conditions funding on compliance with these rules. Additionally, DHS includes specifications for the bidding process, contractor qualification, conduct, and the goods purchased.

**The City of Norfolk's Receipt of Federal Funding to Purchase NFPA 1971-Compliant Turnout Gear**

32.     In interpreting the federal government's specifications included in the AFG Program, in 2016, the City of Norfolk drafted a bid outlining specifications for the turnout gear it sought to purchase. This bid specifically requested turnout gear that contained PFAS. *See* City of Norfolk Notice Invitation for Bid dated January 12, 2016 at p. 7, attached hereto as Exhibit B (explicitly seeking to purchase a PTFE-containing moisture barrier). The bid also sought NFPA 1971-compliant turnout gear and required that the design of the turnout gear conform with all

OSHA regulations. *See id.* at pp. 6, 39.

33. The City of Norfolk received funding through the AFG Program several times, including in 2019 for $1,330,745. Upon information and belief, this funding was used to contract with a Globe distributor, which, in turn, contracted with Globe, to make built-to-order turnout gear for Norfolk firefighters, including Decedent.

**The City of Norfolk Mutual Aid Agreement with the United States Navy**

34. The City of Norfolk operated under a Mutual Aid Agreement to provide firefighting services to the U.S. Navy. *See* Norfolk, VA, Ordinance 28,751 (Jan. 25, 1977). The Agreement treats the federal government and the City of Norfolk as contracting parties.[7]

35. Under the Mutual Aid Agreement, the City of Norfolk would provide "apparatus, personnel, *and equipment*…" to respond to fires on federal property. *Id.* (emphasis added).

36. Upon information and belief, the City of Norfolk required Globe's turnout gear to comply with its contractual agreement with the federal government, pursuant to the Mutual Aid Agreement.

**LEGAL STANDARD**

37. Federal officer removal allows federal officers, or individuals acting under the direction of federal officers, including subcontractors, to remove a case from state to federal court. 28 U.S.C. § 1442(a)(1). The purpose of the statute is to provide a federal forum for defendants who are sued or prosecuted in state courts for actions taken under the color of federal office. *Willingham v. Morgan*, 395 U.S. 402, 407 (1969). This ensures that federal officers and persons

---

[7] The 1977 Ordinance "is an update of the original agreement between the two parties and substantially similar." The earlier Agreement, from 1961, refers to the City and federal government as "Contracting Parties." *See* Norfolk, VA, Ordinance 21,192 (Oct. 31, 1961).

acting under them can perform their duties without undue interference from state courts and provides a neutral forum for cases involving federal interests. *Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 254 (4th Cir. 2017).

38.     To assert federal officer removal, the defendant must plausibly allege three elements: (i) it is a federal officer or person acting under a federal officer; (ii) it has a colorable federal defense; and (iii) the charged conduct was carried out for or in relation to the asserted authority. *Id.*

39.     **Federal officer jurisdiction is to be "liberally construed" in favor of removal**, *Watson v. Philip Morris Cos.*, 551 U.S. 142, 147 (2007), as it is intended that a defense of official federal immunity should be tried in federal court. *Willingham*, 395 U.S. at 407. "This policy should not be frustrated by a narrow, grudging interpretation of [§] 1442(a)(1)." *Id.* As such, **the "ordinary 'presumption against removal' does not apply" to federal officer jurisdiction**. *Cnty. Bd. of Arlington Cnty., Va. v. Express Scripts Pharmacy, Inc.*, 996 F.3d 243, 251 (4th Cir. 2021) (citation omitted). The requirements that federal agents must meet to establish federal officer jurisdiction are "quite low," are "interpreted broadly," and "impose[] few limitations." *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 136-38 (2d Cir. 2008).

40.     Thus, "a defendant's notice of removal need include only . . . plausible allegation[s]" regarding the removal requirements. *Dart Cherokee Basin Operating Co. v. Owens*, 574 U.S. 81, 89 (2014). Courts must "credit the [removing defendant's] theory of the case," *Jefferson Cnty., Ala. v. Acker*, 527 U.S. 423, 432 (1999).

41.     Additionally, the well-pleaded complaint rule does not apply to federal officer removal. *Kircher v. Putnam Funds Tr.*, 547 U.S. 633, 644 n.12 (2006). Section 1442(a)(1) is "an exception to the well-pleaded complaint rule," *Ripley v. Foster Wheeler LLC*, 841 F.3d 207, 210

(4th Cir. 2016), which means that actions against federal agents "may be removed despite the nonfederal cast of the complaint" so long as "the defense depends on federal law." *Acker*, 527 U.S. at 431. Further, § 1442(a)(1) authorizes removal of the entire case even if only one of the controversies it raises involves a federal officer or agency. 14C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3726 (4th ed. 2015).

## **ARGUMENT**

42.      Globe satisfies the three elements required to invoke federal officer removal:

i.      in selling turnout gear to the City of Norfolk, Globe was a person[8] "acting under" DHS and FEMA, both federal officers, in complying with their precise specifications for turnout gear compliant with NFPA 1971; additionally, Globe was "acting under" the U.S. Navy as a subcontractor for the City of Norfolk in fulfillment of the City's Mutual Aid Agreement with the U.S. Navy;

ii.      Globe has a colorable federal government contractor defense because Globe designed and manufactured turnout gear for Decedent in conformance with precise DHS/FEMA specifications that explicitly cited to and required turnout gear compliant with NFPA 1971, as well as the City of Norfolk's interpretation of those federal specifications requiring the use of PFAS-containing fabrics in the turnout gear. Moreover, the federal government had at least as much knowledge as Globe about the alleged dangers of PFAS; and

iii.      there is a connection between the conduct by Globe that Plaintiff challenges in this case—specifically, the use of PFAS-containing materials in turnout gear—and the

---

[8] For purposes of § 1442(a)(1), the term "person" includes "corporations, companies, associations, firms, [and] partnerships." *Papp v. Fore-Kast Sales Co*., 842 F.3d 805, 812 (3d Cir. 2016) (quoting 1 U.S.C. § 1).  The Removing Defendant is an LLC and thus is a person for purposes of removal.

federal authority that required the turnout gear to incorporate PFAS-containing materials.

*Globe Acted Under a Federal Officer in Selling PFAS-Containing Turnout Gear to the City of Norfolk.*

43.     Globe was acting under a federal officer when it manufactured built-to-order turnout gear for the City of Norfolk.

44.     The Supreme Court has interpreted the phrase "acting under" to contemplate a relationship where the government exerts "subjection, guidance, or control," *Watson*, 551 U.S. at 151 (quoting *Webster's New International Dictionary* 2765 (2d ed. 1953)), and where the private entity engages in an effort "to assist, or to help carry out, the duties or tasks of the federal superior." *Id.* at 152 (emphasis omitted); *see also W. Va. State Univ. Bd. of Governors v. Dow Chem. Co.*, 23 F.4th 288, 299 (4th Cir. 2022); *Sawyer*, 860 F.3d at 254. In addition, the Supreme Court has stated that the phrase "acting under" is "broad" and is to be "liberally construed" in favor of the entity seeking removal. *Sawyer*, 860 F.3d at 255.

45.     Courts have unhesitatingly treated the "acting under" requirement as satisfied where a contractor seeks to remove a case involving injuries arising from a product that it "*manufactured for the government*," including as a subcontractor. *Id.*; *see also Hurley v. CBS Corp.*, 648 F. App'x 299, 303 (4th Cir. 2016) (per curiam) ("GE is a 'person acting under' a federal officer because it was acting under a valid government contract at all times relevant to the litigation"); *Express Scripts*, 996 F.3d at 253 (holding that subcontractor was "acting under" the federal government even where primary contractor held the direct contract); *Papp v. Fore–Kast Sales Co.*, 842 F.3d 805, 813 (3d Cir. 2016) ("Papp's allegations are directed at actions Boeing took while working under a federal contract to produce an item the government needed, to wit, a military aircraft, and that the government otherwise would have been forced to produce on its

own.").

46.     While the Complaint fails to allege which brand of turnout gear Decedent wore at each point during his career (or at any point during his career), upon information and belief, Globe manufactured a set of turnout gear for Decedent in 2019.

47.     In order to purchase that turnout gear for Decedent, the City of Norfolk contracted with a Globe distributor, which then subcontracted with Globe. The City of Norfolk required that Globe manufacture the turnout gear in accordance with the City's interpretation of the federal government's specifications for turnout gear, which required the use of PFAS.

48.     Upon information and belief, the City of Norfolk used federal funding to purchase the built-to-order, federally-specified Globe turnout gear. Using the federal funding to purchase just *any* firefighter protective clothing from just *any* source was not an option, as the purchase would not have been eligible for the federal funding without compliance with the federal specifications, including the use of PFAS-containing fabrics.

49.     Even if federal grant recipients, in general, are not necessarily government contractors, **the City of Norfolk is differently situated.**

50.     Upon information and belief, the City of Norfolk purchased Globe's turnout gear, at least in part, to fulfill its contract with the U.S. Navy to provide firefighting services.

51.     In fulfilling the contract for turnout gear pursuant to DHS/FEMA's specifications under the AFG Program, and in producing turnout gear pursuant to the City of Norfolk's contract with the U.S. Navy to provide firefighting services, Globe was acting under a federal officer. Therefore, the first requirement for federal officer removal is satisfied.

*Globe Has a Colorable Federal Government Contractor Defense Because Globe Designed and Manufactured Turnout Gear for Decedent Pursuant to Precise DHS/FEMA Specifications Which Required the Use of PFAS-Containing Materials.*

52.     Globe has a colorable federal government contractor defense to Plaintiff's claims.

53.     The colorable federal defense prong is a "low bar." *Express Scripts*, 996 F.3d at 255. "Courts have imposed few limitations on what qualifies as a colorable federal defense. At its core, the defense prong requires that the defendant raise a claim that is 'defensive' and 'based in federal law.'" *Id.* at 254 (citations omitted). "To be 'colorable,' the defense need not be 'clearly sustainable,' as the purpose of the statute is to secure that the validity of the defense will be tried in federal court." *Id.*; *see also Isaacson*, 517 F.3d at 139 (quoting *Willingham*, 395 U.S. at 406-07). Thus, the defense need only be plausible. *Express Scripts*, 996 F.3d at 254.

54.     The government contractor defense shields contractors from liability for defects in products designed and manufactured for the federal government, as well as from liability for failing to warn of those defects. *Boyle v. United Techs. Corp.*, 487 U.S. 500, 512 (1988); *see also Sawyer*, 860 F.3d at 256 (confirming that the *Boyle* articulation of the defense applies to design defect and failure to warn claims). The defense is rooted in the principle that contractors (and subcontractors) should not be held liable when they have complied with government specifications. *Ruddell v. Triple Canopy, Inc.*, No. 1:15-CV-01331 (LMB/JFA), 2016 WL 4529951, at *5 (E.D. Va. Aug. 29, 2016); *see also Ramey v. Martin-Baker Aircraft Co.*, 874 F.2d 946, 947 (4th Cir. 1989) (finding government contractor immunity applied to subcontractor to direct federal contractor).

55.     The government contractor immunity applies when: (i) the government "approved reasonably precise specifications"; (ii) the contractor's performance "conformed to those specifications"; and (iii) the contractor alerted the government to dangers "known to [the

contractor] but not to the United States." *Express Scripts*, 996 F.3d at 255 (citation omitted); *see also Boyle,* 487 U.S. at 512; *Ripley*, 841 F.3d at 210.

56.     Upon information and belief, Globe designed and manufactured a set of turnout gear for Decedent, in conformance with the specifications as outlined by DHS/FEMA, which explicitly cited to NFPA 1971.

57.     Moreover, Globe designed and manufactured a set of turnout gear for Decedent, in conformance with the City of Norfolk's interpretation of the specifications as outlined by DHS/FEMA, which explicitly required the use of PFAS-containing fabrics. Upon information and belief, by awarding the grant funding, DHS/FEMA approved the City of Norfolk's interpretation of the federal specifications as consistent with the requirements of the federal AFG Program.

58.     The turnout gear that Globe manufactured for the City of Norfolk Fire Department conformed to NFPA 1971 standards.

59.     Globe was not (and is not currently) aware of any dangers of PFAS unknown to the United States. Globe relies on its suppliers for information about the components of its specialty fabrics, as Globe itself does not intentionally add PFAS to any component of its turnout gear.

60.     FEMA has stated concerns about PFAS generally, including that exposure to PFAS "may be associated with adverse health effects." *See* DHS, Notice of Funding Opportunity, Fiscal Year 2021 Assistance to Firefighters Grant Program at 48 (2021), https://www.fema.gov/sites/default/files/documents/fema_fy21-afg-nofo.pdf ("2021 NOFO").

61.     The Complaint cites to a 2018 federal draft toxicology report analyzing scientific data about PFAS and allegedly "finding that PFAS 'are potentially more hazardous than previously known.'" *See* Compl. ¶ 85 (citing to a draft report from the Agency for Toxic Substances and Disease Registry (ASTDR), a division of the Centers for Disease Control and Prevention and the

U.S. Department of Health and Human Services).

62.     The Complaint cites to an FDA study testing PFAS in food and food packaging materials. *See* Compl. ¶ 59 n.17.

63.     The Complaint cites to EPA studies allegedly about the toxicity of PFAS. *See* Compl. ¶ 60.

64.     **The Complaint also cites to statements from the federal government regarding potential adverse effects of PFAS dating back to at least the year 2000—nearly twenty years before the federal government funded and specified PFAS-containing turnout gear for Decedent**. *See* Compl. ¶ 72.

65.     **The United States knew *at least* as much as Globe knew or has ever known about the alleged health risks of PFAS, and, upon information and belief, the United States likely knew substantially more than Globe about the alleged health risks of PFAS through their purchase and use of PFAS-containing Class B foam.**

66.     Using federal funding and in conformance with federal guidelines, Globe provided to the City of Norfolk exactly what it contracted for—what it was *required* to contract for under the federal AFG Program. In their contract, the City of Norfolk specified exactly which specialty PFAS-containing fabrics it wanted Globe to use in the turnout gear.

67.     **The City of Norfolk specified** "an enhanced biocomponent membrane comprised of an expanded **PTFE** (polytetrafluoroethylene, for example in Teflon®) matrix having a continuous hydrophilic (i.e. water-loving) and Oleophobic (i.e. oil-hating) coating that is impregnated into the matrix." *See* Ex. B at p. 7.

68.     Globe thus satisfies the second requirement for the government contractor defense and, by extension, the colorable federal defense prong of federal officer removal.

*Globe's Alleged Conduct and Federal Officer Authority Are Connected*.

69.     Globe's manufacture of turnout gear for the City of Norfolk was carried out for and in relation to official federal authority.

70.     The federal officer removal statute requires that the act in question be "for or relating to" any act under color of federal office. 28 U.S.C. § 1442(a)(1). Congress added the words "or relating to" in 2011. *See* Removal Clarification Act of 2011, Pub. L. No. 112–51, 125 Stat. 545. The revised language broadened the availability of federal removal, such that there need only be "a connection or association between the act in question and the federal office." *Sawyer*, 860 F.3d at 258 (citation omitted). Courts have held that there is no need to demonstrate "an airtight case on the merits in order to show the required causal connection." *Id.*

71.     Plaintiff alleges that Defendants made or sold "PFAS-containing materials" in turnouts and that Decedent "wore turnouts in the usual and normal course of performing his firefighting duties and training and was repeatedly exposed to PFAS in his workplace." Compl. ¶¶ 6, 8. Plaintiff further alleges that "exposure to PFAS resulted in Decedent Griffin developing glioblastoma brain cancer," and his subsequent death on October 1, 2021. *Id.* ¶ 11.

72.     As noted above, Plaintiff does not allege which brand of turnout gear Decedent wore. Upon information and belief, Decedent's primary turnout gear set was destroyed and is thus unavailable for inspection or testing. However, upon information and belief, Plaintiff made available for inspection, to another Defendant, a 2019 set of turnout gear allegedly belonging to Decedent. Upon information and belief, this set of turnout gear was manufactured by Globe and purchased with the above-mentioned DHS/FEMA funding. Thus, Plaintiff alleges that Decedent was harmed by his turnout gear that was purchased when the federal government contracted with

Globe in 2019.[9]

73.     Globe thus satisfies the third requirement for federal officer removal.

74.     All three requirements for federal officer removal are readily satisfied and removal of this action is therefore proper under 28 U.S.C. § 1441(a).

75.     Accordingly, Globe is entitled to remove this action to federal court pursuant to the federal officer removal statute, 28 U.S.C. § 1442(a)(1).

## <u>CONCLUSION</u>

76.     For the above-mentioned reasons, this case belongs in federal court pursuant to federal officer jurisdiction and Globe hereby removes this action from the Circuit Court for the City of Norfolk to this Court pursuant to 28 U.S.C. § 1442(a)(1).

---

[9] Globe reserves all rights to dispute Plaintiff's failure to identify the precise products and/or brands used by Decedent. Globe also reserves all rights to explore in discovery whether Decedent did, in fact, wear and use the turnout gear that the City of Norfolk commissioned for Decedent. Furthermore, to the extent Plaintiff does not allege that Decedent was exposed to PFAS from turnout gear assembled by Globe, Globe should be dismissed from this action. Finally, Globe reserves all rights to argue spoliation if Decedent's turnout gear was, in fact, destroyed.

Dated: October 7, 2024

Respectfully submitted,
**GLOBE MANUFACTURING
COMPANY, LLC**

By:  */s/ Lynn K. Brugh, IV*____
Lynn K. Brugh, IV
Virginia State Bar No. 36778
Counsel for Defendant
WILLIAMS MULLEN
200 South 10th Street, Suite 1600
Richmond, Virginia 23219
Telephone: (804) 420-6461
Facsimile: (804) 420-6507
lbrugh@williamsmullen.com

George H. Bowles
Virginia State Bar No. 38574
WILLIAMS MULLEN
999 Waterside Drive, Suite 1700
Norfolk, VA 23510-3303
Telephone: (757) 622-3366
Facsimile: (757) 629-0660
gbowles@williamsmullen.com

John A. Irvin
Virginia State Bar No. 97044
WILLIAMS MULLEN
200 South 10th Street, Suite 1600
Richmond, Virginia 23219
Telephone: (804) 420-6140
Facsimile: (804) 420-6507
jirvin@williamsmullen.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 7th day of October 2024, a true and correct copy of Notice of

Removal was filed with the Court and a copy was served via electronic mail upon:

> Kevin Biniazan
> Jeffrey A. Breit
> Michael D. Collett
> Lauren Martin
> Breit Biniazan, PC
> Towne Pavilion Center II
> 600 22nd Street, Suite 402
> Virginia Beach, VA 23451
> kevin@bbtrial.com
> jeffrey@bbtrial.com
> michael@bbtrial.com
> lauren@bbtrial.com

I hereby certify that on this 7th day of October 2024, a true and correct copy of Notice of

Removal was filed with the Court and a copy was served, along with the Notice of Electronic

Filing (NEF), via U.S. Mail, postage prepaid, upon the listed Defendants.

I further certify that, pursuant to 28 U.S.C. § 1446(d), on the 7th day of October 2024, a

copy of the foregoing Notice of Removal was filed via electronically with the Clerk's Office of

the Circuit Court for the City of Norfolk.

> By:   */s/ Lynn K. Brugh, IV*
> Lynn K. Brugh, IV
> Virginia State Bar No. 36778
> Counsel for Defendant
> WILLIAMS MULLEN
> 200 South 10th Street, Suite 1600
> Richmond, Virginia 23219
> Telephone: (804) 420-6461
> Facsimile: (804) 420-6507
> lbrugh@williamsmullen.com