**IN THE UNITED STATES DISTRICT COURT FOR THE**
**EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

**AIMEE MARIE JENKINS-GRIFFIN,**
**Administrator of the Estate of**
**CHRISTOPHER GEORGE GRIFFIN,**
**Deceased,**

        **Plaintiff,**

                                      **Civil Action No. <u>2:24-cv-600</u>**
**v.**                                         **TRIAL BY JURY DEMANDED**

**3M COMPANY;**
**E. I. DU PONT DE NEMOURS & CO., a/k/a EIDP, Inc.;**
**THE CHEMOURS COMPANY L.L.C.;**
**ARCHROMA U.S., INC.;**
**ARKEMA, INC.;**
**AGC CHEMICALS AMERICAS, INC.;**
**DAIKIN AMERICA, INC.;**
**MINE SAFETY APPLIANCE COMPANY LLC;**
**MSA SAFETY SALES, LLC;**
**GLOBE MANUFACTURING COMPANY LLC;**
**LION GROUP, INC.;**
**W. L. GORE & ASSOCIATES, INC.;**
**TEN CATE PROTECTIVE FABRICS USA, d/b/a**
**SOUTHERN MILLS INC.;**
**PBI PERFORMANCE PRODUCTS, INC.;**
**HONEYWELL INTERNATIONAL, INC.;**
**HONEYWELL SAFETY PRODUCTS USA, INC.;**
**STEDFAST USA, INC.;**
**MALLORY SAFETY AND SUPPLY LLC;**
**MUNICIPAL EMERGENCY SERVICES INC.; and**
**BRADSDEN SOLUTIONS, INC.,**

        **Defendants.**

## FIRST AMENDED COMPLAINT

COMES NOW Plaintiff, Aimee Marie Jenkins-Griffin, Administrator of the Estate of

Christopher George Griffin, deceased, who moves this Honorable Court for judgment against


EXHIBIT
B

Defendants 3M Company; E.I. du Pont de Nemours & Co. a/k/a EIDP, Inc.; The Chemours Company, LLC; Archroma U.S., Inc.; Arkema, Inc.; AGC Chemicals Americas, Inc.; Daikin America, Inc.; Mine Safety Appliance Company, LLC; MSA Safety Sales, LLC; Globe Manufacturing Company, LLC; Lion Group, Inc.; W. L. Gore & Associates, Inc.; Ten Cate Protective Fabrics USA d/b/a Southern Mills, Inc.; PBI Performance Products, Inc.; Honeywell International, Inc.; Honeywell Safety Products USA, Inc.; StedFast USA, Inc.; Mallory Safety and Supply, LLC; Municipal Emergency Services, Inc.; and Bradsden Solutions, Inc., for the wrongful death of Christopher George Griffin, in the sum of SEVENTY FIVE MILLION DOLLARS ($75,000,000.00) in compensatory damages, ONE HUNDRED FIFTY MILLION DOLLARS ($150,000,000.00), the cost of this action, prejudgment interest from September 29, 2023, and for such other relief this Court deems just and proper on the grounds set forth below:

## INTRODUCTION

1. Christopher George Griffin, deceased, ("Decedent Griffin") was a firefighter who served the City of Norfolk.

2. Plaintiff Aimee Marie Jenkins-Griffin ("Plaintiff Griffin") brings this action for harm and death resulting from her husband's exposure to per- and polyfluoroalkyl substances ("PFAS") that were manufactured, designed, sold, supplied, distributed and/or contained in protective clothing specifically designed for firefighters ("turnouts") manufactured, designed, sold supplied and/or distributed by each of the Defendants, individually or through their predecessors or subsidiaries.

3. PFAS are human-made chemicals consisting of a chain of carbon and fluorine atoms used in manufactured products to, *inter alia*, resist and repel oil, stains, heat and water. PFAs

include "long-chain" PFAS made up of seven or more carbon atoms ("long-chain PFAS") as well as "short-chain" PFAS made up of six or fewer carbon atoms ("short-chain PFAS").

4.      PFAS are known as "forever chemicals" because they are immune to degradation, bioaccumulate in individual organisms and humans, and increase in concentration up the food chain. PFAS exposure to humans can occur through inhalation, ingestion and dermal contact.[1]

5.      PFAS have been associated with multiple and serious adverse health effects in humans including cancer, tumors, liver damage, immune system and endocrine disorders, high cholesterol, thyroid disease, ulcerative colitis, birth defects, decreased fertility, and pregnancy-induced hypertension. PFAS have also been found to concentrate in human blood, bones, and organs.

6.      Unbeknownst to Decedent Griffin, Defendants manufactured, marketed, distributed, sold, or used PFAS and PFAS-containing materials in protective clothing specifically designed for firefighters ("turnouts").

7.      For decades, Defendants were aware of the toxic nature of PFAS and the harmful impact these substances have on human health. Yet, Defendants manufactured, designed, marketed, sold, supplied, or distributed PFAS-containing turnouts to firefighting training facilities and fire departments nationally, including in Virginia and in the City of Norfolk. Defendants did so, moreover, without ever informing firefighters or the public that turnouts contained PFAS, and without warning firefighters or the public of the substantial and serious health injuries that can result from exposure to PFAS or PFAS-containing materials.

---

[1] Suzanne E. Fenton, MS, PhD, *PFAS Collection*, Environmental Health Perspectives (February 22, 2019), https://ehp.niehs.nih.gov/curated-collections/pfas.

8.    As a firefighter, Decedent Griffin wore turnouts in the usual and normal course of performing his firefighting duties and training and was repeatedly exposed to PFAS in his turnouts. He did not know and, in the exercise of reasonable diligence, could not have known that his turnouts contained PFAS or PFAS-containing materials. He also did not know that PFAS was in his body and blood.

9.    At all relevant times and continuing to the present, Defendants have represented that their turnouts are safe.

10.    Decedent Griffin used the turnouts as they were intended and in a foreseeable manner which exposed him to PFAS in the course of his firefighting activities. This repeated and extensive exposure to PFAS resulted in Decedent Griffin developing glioblastoma brain cancer. He died on October 1, 2021.

11.    Defendants knowingly and willfully manufactured, designed, marketed, sold, and distributed chemicals and/or products containing PFAS for use within the State of Virginia when they knew or reasonably should have known that Decedent Griffin would repeatedly inhale, ingest, and/or have dermal contact with these harmful compounds during the ordinary course of his profession, during firefighting training exercises and in firefighting emergencies, and that such exposure would threaten the health and welfare of firefighters exposed to these dangerous and hazardous chemicals.

**PARTIES**

12.    Plaintiff Griffin is an adult resident of the Commonwealth of Virginia. She is the widowed spouse of Decedent Griffin, and the Clerk of the Norfolk Circuit Court qualified her as Administrator of Decedent Griffin's estate for the purpose of prosecution of a civil action for wrongful death.

13.     Defendant 3M Company (a/k/a Minnesota Mining and Manufacturing Company) ("3M") is a Delaware corporation that does business throughout the United States, including conducting business in Virginia. 3M has its principal place of business in St. Paul, Minnesota. 3M developed, manufactured, marketed, distributed, released, sold and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including in Virginia and in the City of Norfolk.

14.     Defendant E.I. du Pont de Nemours & Co., also known as EIDP, Inc. ("DuPont"), is a Delaware corporation that does business throughout the United States, including conducting business in Virginia. DuPont has its principal place of business in Wilmington, Delaware. DuPont developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including in Virginia and in the City of Norfolk.

15.     Defendant The Chemours Company, LLC ("Chemours") is a Delaware corporation that does business throughout the United States, including conducting business in Virginia. Chemours has its principal place of business in Wilmington, Delaware. Chemours developed, manufactured, marketed, distributed, released, sold and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including in Virginia and in the City of Norfolk.

16.     Defendant Archroma U.S., Inc. ("Archroma") is a North Carolina corporation that does business throughout the United States, including conducting business in Virginia. Archroma has its principal place of business in Charlotte, North Carolina. Archroma developed, manufactured, marketed, distributed, released, sold and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including in Virginia and in the City of Norfolk.

17. Defendant Arkema, Inc. ("Arkema") is a Pennsylvania corporation that does business throughout the United States, including conducting business in Virginia. Arkema has its principal place of business in King of Prussia, Pennsylvania. Arkema developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including in Virginia and in the City of Norfolk.

18. Defendant AGC Chemicals Americas, Inc. ("AGC") is a Delaware corporation that does business throughout the United States, including conducting business in Virginia by and through its introduction of its products and goods into the stream of commerce which it knew or had reason to know would enter, be sold, used, and consumed throughout the Commonwealth of Virginia. AGC has its principal place of business in Exton, Pennsylvania. AGC developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including in Virginia and the City of Norfolk.

19. Defendant Daikin America, Inc. ("Daikin America") is a Delaware corporation that does business throughout the United States, including conducting business in Virginia. Daikin America has its principal place of business in Orangeburg, New York. Daikin America developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including in Virginia and the City of Norfolk.

20. Defendant Mine Safety Appliance Company, LLC ("MSA/Globe") is a Pennsylvania corporation that does business throughout the United States, including conducting business in Virginia. MSA has its principal place of business in Cranberry Township, Pennsylvania. MSA acquired Globe Holding Company, LLC and its subsidiaries (collectively, "MSA/Globe") in 2017 and continues to do business under the Globe name. MSA developed,

manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including in Virginia and in the City of Norfolk.

21.     Defendant MSA Safety Sales, LLC ("MSA Safety Sales") is a Pennsylvania corporation that does business throughout the United States, including conducting business in Virginia. MSA has its principal place of business in Cranberry Township, Pennsylvania. MSA Safety Sales developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including in Virginia and in the City of Norfolk.

22.     Defendant Globe Manufacturing Company, LLC ("Globe") is a New Hampshire corporation that does business throughout the United States, including conducting business in Virginia. Globe has its principal place of business in Pittsfield, New Hampshire. Globe developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including in Virginia and in the City of Norfolk. Defendant Mine Safety Appliance Company acquired Globe Holding Company, LLC and its subsidiaries (collectively, "MSA/Globe") in 2017 and continues to do business under the Globe name.

23.     Defendant Lion Group, Inc., ("Lion") is an Ohio corporation that does business throughout the United States, including conducting business in Virginia by and through its introduction of its products and goods into the stream of commerce which it knew or had reason to know would enter, be sold, used, and consumed throughout the Commonwealth of Virginia. Lion has its principal place of business in Dayton, Ohio. Lion developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including in Virginia and the City of Norfolk.

24. Defendant W. L. Gore & Associates, Inc., ("Gore") is a Delaware corporation that does business throughout the United States, including conducting business in Virginia. Gore has its principal place of business in Newark, Delaware. Gore developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including in Virginia and in the City of Norfolk.

25. Defendant Ten Cate Protective Fabrics USA d/b/a Southern Mills, Inc. ("Tencate") is a Georgia corporation that does business throughout the United States, including conducting business in Virginia by and through its introduction of its products and goods into the stream of commerce which it knew or had reason to know would enter, be sold, used, and consumed throughout the Commonwealth of Virginia. Tencate has its principal place of business in Senoia, Georgia. Tencate developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including in Virginia and the City of Norfolk.

26. Defendant PBI Performance Products, Inc., ("PBI") is a Delaware corporation that does business throughout the United States, including conducting business in Virginia. PBI has its principal place of business in Charlotte, North Carolina. PBI developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including in Virginia and the City of Norfolk.

27. Defendant Honeywell International, Inc. ("Honeywell International") is a Delaware corporation that does business throughout the United States, including conducting business in Virginia. Honeywell Int'l has its principal place of business in Charlotte, North Carolina. Honeywell International developed manufactured, marketed, distributed, released, sold and/or

used PFAS, PFAS materials, and products containing PFAS turnouts, including in Virginia and City of Norfolk.

28.    Defendant Honeywell Safety Products USA, Inc. ("Honeywell") is a Delaware corporation that does business throughout the United States, including conducting business in Virginia. Honeywell has its principal place of business in Charlotte, North Carolina. Honeywell developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including in Virginia and the City of Norfolk.

29.    Defendant StedFast USA, Inc. ("StedFast") is a Delaware corporation that does business throughout the United States, including conducting business in Virginia. StedFast has its principal place of business in Piney Flats, Tennessee. StedFast developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including in Virginia and the City of Norfolk.

30.    Mallory Safety and Supply, LLC ("Mallory") is a California corporation that does business throughout the United States, including conducting business in Virginia. Mallory has its principal place of business in Portland, Oregon. Mallory developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including in Virginia and the City of Norfolk.

31.    Municipal Emergency Services, Inc. ("MES") is a Nevada corporation that does business throughout the United States, including conducting business in Virginia. MES has its principal place of business in Sandy Hook, Connecticut.  MES developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts, including in Virginia and the City of Norfolk.

32.     Bradsden Solutions, Inc. ("Bradsden"), formerly Blue Ridge Rescue Suppliers, Inc. and still doing business as Blue Ridge Rescue Suppliers, Inc., is a Virginia stock corporation that does business throughout the Commonwealth of Virginia including conducting business in and with the City of Norfolk by and through its sale and distribution of turnouts to the Norfolk Fire Department. Bradsden developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts in Virginia and the City of Norfolk.

## JURISDICTION AND VENUE

33.     This Court has personal jurisdiction over the Defendants pursuant to Va. Code § 8.01-328.1(A)(1)–(4), as the cause of action arises from the foreign Defendants' transacting business in Virginia, contracting to supply services or things in Virginia, causing tortious injury by an act or omission in Virginia, and causing tortious injury by an act or omission outside of Virginia when they regularly conduct business in Virginia.

34.     This Court has general and specific jurisdiction over Defendants, as they have purposefully availed themselves of the privileges of conducting business activities within Virginia through the marketing, sale, and distribution of products and services in Virginia, and/or profiting from such activity; they have purposefully directed activities towards Virginia and Virginia residents; and this litigation results from injuries that arose out of those activities.

35.     This Court has general jurisdiction over Defendants by virtue of their purposeful, continuous, systematic contacts, and general business purpose in Virginia.

36.     Decedent Griffin's exposure and injuries, resulting from the acts of Defendants alleged herein, occurred in Norfolk, Virginia.

37.     Venue is proper in this Court under Va. Code § 8.01-262(2), (3), (4) and (8).

## SUBSTANTIVE ALLEGATIONS

### A. Decedent Griffin's Use of and Exposure to PFAS-Containing Products

38.     Decedent Griffin proudly served the City of Norfolk as a firefighter for the Norfolk Fire-Rescue Department for almost 10 years. Prior to serving the City of Norfolk, Decedent Griffin worked as a firefighter in Pennsylvania for 20 years.

39.     As a first responder to fire, hazardous materials incidents, and other emergency and medical calls, Decedent Griffin risked his life on a daily basis. He not only saved lives and homes but also provided emergency services and medical care, performed rescues, and offered support to people in traumatic circumstances. To prepare him for this enormously challenging work, Decedent Griffin wore turnouts and received extensive and ongoing training in fire suppression, fire prevention, rescue, and emergency medical care action to protect and/or minimize the loss of life, property, and damage to the environment.

40.     The Norfolk Fire-Rescue Department ("NFRD") has served the residents of Norfolk, Virginia for over 100 years. Norfolk firefighters are cross-trained fire and emergency medical service ("EMS") providers. NFRD protects the city's residents, workers and tourists in high-rise buildings, schools, hospitals, churches, community centers, stores, historical landmarks, tunnels, bridges, hotels, and residential structures in densely populated neighborhoods.

41.     For decades, Defendants, either individually or through their predecessors or subsidiaries, have manufactured, designed, sold, supplied, and distributed turnouts containing PFAS to firefighters, firefighting training facilities, and fire departments globally, including within the State of Virginia and the City of Norfolk and neighboring communities in Virginia.

42.     With over 5,000 individual chemicals, PFAS is a large and ever-growing category of human-made chemicals, consisting of a nearly indestructible chain of carbon and fluorine atoms

that are widely used in products to, *inter alia*, resist and repel oil, heat and water, and have been found to have negative health effects. As detailed below, these toxic chemicals are present in firefighter turnouts.

### (1) PFAS-Containing Turnout Gear

43.     During firefighting training and when responding to fires and performing fire extinguishment, firefighters wear turnouts that are intended to provide a degree of thermal, chemical, and biological protection for a firefighter. Turnout gear components include a helmet, hood, jacket, pants, boots, and gloves. Each component is made of an outer layer, as well as several inner layers that include a moisture barrier and thermal liner which are meant to protect the firefighter from ambient heat.[2]

44.     A June 2020 study of turnout gear by researchers at the University of Notre Dame analyzed 30 new and used turnout jackets and pants originally marketed, distributed and sold in 2008, 2014, and 2017, by six turnout gear makers, including Defendants MSA/Globe, Lion and Honeywell, and found high levels of PFAS in turnout gear worn, used, or handled by firefighters, including Decedent Griffin.[3]

45.     In May 2023, Section 338 of the William M. Thornberry National Defense Authorization Act for titled the "Guaranteeing Equipment for Safety for Firefighters Act of 2020," directed the National Institute of Standards and Technology ("NIST") to identify the type,

---

[2] *What Materials Go Into Making Turnout Gear?*, Globe MSA Safety Website, (last visited September 26, 2023), https://globe.msasafety.com/selecting-your-gear/materials.
[3] Graham Peaslee et al., *Another Pathway for Firefighter Exposure to Per- and Polyfluoroalkyl Substances: Firefighter Textiles*, Environmental Science & Technology Letters 2020, 7, 8, 594-599 (Ecotoxicology and Public Health) (June 23, 2020) (hereinafter, "the Notre Dame Turnout Study").

prevalence and concentration of PFAS in unused firefighter turnout gear.[4] The study specifically looked at twenty textiles used to make firefighter turnout gear. The NIST study found between one and seventeen PFAS present in each textile used to construct the turnout gear.[5]

46.    When exposed to heat, PFAS chemicals in the turnouts off-gas, break down, and degrade into highly mobile and toxic particles and dust,[6] exposing firefighters to PFAS chemicals, particles and dust, including through skin contact/absorption, ingestion (e.g., hand-to-mouth contact) and/or inhalation.[7] Further firefighter exposure to these highly mobile and toxic materials occurs through normal workplace activities, because particles or dust from their turnouts spread to fire vehicles and fire stations, as well as firefighters' cars and homes.[8]

47.    Such workplace exposure to PFAS or PFAS-containing materials has been found to be toxic to humans. As far back as a July 31, 1980, internal memo, DuPont officials described measures that were needed to prevent workplace exposure to PFOA, which they knew could permeate all protective materials, and noted that PFOA's toxicity varied depending on the exposure pathway, acknowledging that ingestion was "slightly toxic," dermal contact was "slightly to moderately toxic" and inhalation was "highly toxic."[9] The memo concluded "continued exposure is not tolerable."[10]

---

[4] Maizel, A., et al., (2023), *Per- and Polyfluoroalkyl Substances in New Firefighter Turnout Gear Textiles*, Technical Note (NIST TN), National Institute of Standards and Technology, https://doi.org/10.6028/NIST.TN.2248, https://tsapps.nist.gov/publication/get_pdf.cfm?pub_id=936242 (Accessed September 28, 2023)
[5] *Id.*
[6] A.S. Young et al., *Per- and Polyfluoroalkyl Substances (PFAS) and Total Fluorine in Fire Station Dust*, J. Expo. Sci. Environ. Epidemiology (2021), https://doi.org/10.1038/s41370-021-00288-7.
[7] *Id.*
[8] *Id.*
[9] Robert Bilott, *Exposure* (2019), pg. 174.
[10] *Id.* at pg. 175.

48.     As alleged herein, Decedent Griffin wore turnouts in the ordinary course of performing his duties, as the turnouts were intended to be used and in a foreseeable manner, which exposed him to significant levels of PFAS. He was diagnosed with glioblastoma brain cancer and died on October 1, 2021.

49.     Decedent Griffin did not know, and in the exercise of reasonable diligence could not have known, that the turnouts he wore or used in the course of performing his duties contained PFAS or PFAS-containing materials, and similarly did not know and could not have known that he routinely suffered exposure to PFAS or PFAS-containing materials in the turnouts he wore or used in performing his duties. The turnout gear worn or used by Decedent Griffin did not contain labeling information saying that the gear contained PFAS, and similarly did not warn Decedent Griffin of the health risks associated with exposure to PFAS.

50.     Like many fire departments across the country, Decedent Griffin had a limited number of turnouts to wear for years, and would wash his turnouts at home and/or in station machines along with his daily station wear uniforms.

**B.  The Chemical Structure of PFAS Makes Them Harmful to Human Health**

51.     PFAS are known as "forever chemicals" because they are immune to degradation, bioaccumulate in individual organisms and humans, and increase in concentration up the food chain.[11] Indeed, scientists are unable to estimate an environmental half-life (i.e., the time it takes

---

[11] *Perfluoroalkyl and Polyfluoroalkyl Substances (PFAS)*, National Institute of Environmental Health Sciences (last visited September 26, 2023), https://www.niehs.nih.gov/health/topics/agents/pfc/index.cfm.

for 50% of the chemical to disappear) for PFAS.[12] Additionally, some PFAS chemicals (known as "precursors") degrade into different long-chain PFAS chemicals.[13]

52.     PFAS are nearly indestructible and are highly transportable.[14] PFAS exposure to humans can occur through inhalation, ingestion, or dermal contact.[15]

53.     PFAS chemicals include "older" long-chain PFAS like PFOA, PFOS, and PFNA that have seven or more carbon atoms, and "newer" short-chain PFAS, like PFBA, PFBS, PFHxA, and PFHxS. The PFAS chemical industry has repeatedly asserted that short-chain PFAS are safer and bio-degrade more easily than long-chain PFAS. However, short-chain PFAS are molecularly similar to long-chain PFAS, and recent scientific research conducted in 2020, shows that short-chain PFAS are in fact extremely persistent, highly mobile and transportable, almost impossible to remove from water, bio-accumulate in humans and the environment, and show similar toxicity as long-chain PFAS.[16] For example, short-chain PFBA (with only four carbon molecules) which was created by defendant 3M and reportedly has a shorter half-life than other PFAS, recently has

---

[12] *Id.*

[13] *Id.* at fn. 8; Monica Amarelo, *Study: Almost All Fluorine Detected in Fire Stations' Dust Is From Unknown "Forever Chemicals,"* Environmental Working Group (February 5, 2021), https://www.ewg.org/release/study-almost-all-fire-stations-dust-unknown-forever-chemicals.

[14] *Toxicological Profile for Perfluoroalkyls, see* Relevance to Public Health, Agency for Toxic Substances & Disease Registry, (last visited September 26, 2023), https://www.atsdr.cdc.gov/toxprofiles/tp.asp?id=1117&tid=237.

[15] *Id.* at Potential for Human Exposure, pg. 535.

[16] Cheryl Hogue, *Short-chain and long-chain PFAS show similar toxicity*, *US National Toxicology Program says*, Chemical and Engineering News, (August 24, 2019), https://cen.acs.org/environment/persistent-pollutants/Short-chain-long-chain-PFAS/97/i33; David Andrews, PhD, FDA Studies: *'Short-Chain' PFAS Chemicals More Toxic Than Previously Thought*, Environmental Working Group (March 9, 2020), https://tinyurl.com/y3lbq7by; Stephan Brendel et al., *Short-chain perfluoroalkyl acids: environmental concerns and a regulatory strategy under REACH*, Environmental Sciences Europe, Vol. 30, 1 (2018), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5834591/; Tom Neltner, The Elephant in the Room: Potential Biopersistence of Short-Chain PFAS, Environmental Defense Fund, (February 20, 2019), http://blogs.edf.org/health/2019/02/20/potential-biopersistence-short-chain-pfas/.

been found to accumulate in the lungs and, in turn, increase the severity of COVID-19 in patients with elevated levels of PFBA,[17] among other health concerns. Short-chain PFAS also have lower technical performance and may therefore be used at higher quantities cancelling out any supposed benefits of lower bioaccumulation potential.[18]

54.      In October 2021, the U.S. Environmental Protection Agency ("EPA") updated its 2018 assessment of short-chain PFAS, also known as "GenX", finding that two of Defendant Chemours GenX chemicals are *more toxic* than PFOA - the highly toxic chemical these were intended to replace.[19]

55.      To date, there is no safe, acceptable or "normal" level of PFAS in the human body. Further, the fact that PFOA, PFOS, PFHxS, PFHpA, and PFNA are often found together presents a substantial risk to human health. Defendants' assertions that their products are safe because they do not contain PFOA or PFOS, or because they contain short-chain PFAS is just another example of their efforts to deflect from the reality that there are thousands of PFAS – including precursor PFAS which degrade into PFOA and PFOS.[20]

---

[17] *Exposure to Toxic Chemical Linked with Worse COVID-19 Outcomes*, The Harvard Gazette (Jan. 6, 2021), https://www.hsph.harvard.edu/news/hsph-in-the-news/pfas-exposure-linked-with-worsecovid-19-outcomes/.

[18] Martin Scheringer et al., *Helsingør Statement on Poly- and Perfluorinated Alkyl Substances (PFASs)*, Chemosphere (June 14, 2014), https://www.sciencedirect.com/science/article/pii/S004565351400678X.

[19] Cheryl Hogue, *US EPA Deems Two GenX PFAS Chemicals More Toxic than PFOA*, Chemical & Engineering News (October 28, 2021), https://cen.acs.org/environment/persistent-pollutants/US-EPA-deems-two-GenX-PFAS-chemicals-more-toxic-than-PFOA/99/i40.

[20] Technical Fact Sheet - *Perfluorooctane Sulfonate (PFOS) and Perfluorooctanoic Acid (PFOA)*, United States Environmental Protection Agency, (Nov. 2017), https://19january2021snapshot.epa.gov/sites/static/files/201712/documents/ffrrofactsheet_contaminants_pfos_pfoa_11-20-17_508_0.pdf

56.      PFAS exposure affects nearly every system in the body.[21] It has been associated with multiple and serious adverse health effects in humans including, but not limited to, cancer, tumors, liver damage, immune system and endocrine disorders, thyroid disease, ulcerative colitis, birth defects, decreased fertility, pregnancy-induced hypertension, accelerated changes in gene expression, and increases in oxidative stress which can contribute to DNA changes, tumor promotion, and other health conditions.[22]

### C. Defendants Knowingly Manufactured, Developed, Marketed, Distributed, Supplied, and/or Sold Toxic PFAS and/or Products Containing PFAS

57.      Defendants have each marketed, developed, distributed, sold, promoted, manufactured, released, or otherwise used PFAS chemicals in products, including in PFAS-containing turnout gear, throughout the United States and in Virginia.

58.      PFAS were first developed in the 1930s and 1940s. Soon after, 3M began manufacturing a PFAS material called perfluorooctanoic acid ("PFOA"), selling it to other companies, including DuPont.

59.      By the 1950s, PFAS were widely used in large-scale manufacturing. Prior to this, PFAS had never been detected in nor were present in human blood or bodies.

60.      Founded in 1918, Defendant MSA/Globe began manufacturing, marketing and selling turnout gear with DuPont's NOMEX® PFAS-containing flame resistant fabric in 1966.

---

[21] Kelly Lenox, *PFAS Senate Hearing, Birnbaum's Expert Scientific Testimony*, Environmental Factor, National Institute of Environmental Health Sciences (May 2019), https://factor.niehs.nih.gov/2019/5/feature/1-feature-pfas/index.htm.

[22] A. Koskela et al., *Perfluoroalkyl substances in human bone: concentrations in bones and effects on bone cell differentiation*, Scientific Reports, (July 28, 2017), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5533791/pdf/41598_2017_Article_7359.pdf; *National Toxicology Program Technical Report on the Toxicology and Carcinogenesis Studies of Perfluorooctanoic Acid Administered in Feed to Sprague Dawley (Hsd: Sprague Dawley SD) Rats*, National Toxicology Program, (May 2020), https://ntp.niehs.nih.gov/ntp/htdocs/lt_rpts/tr598_508.pdf.

MSA/Globe (under the Globe name) continues to manufacture, market and sell turnout gear using PFAS-containing fabrics supplied by its partners, DuPont, Gore, Tencate, and PBI.[23]

61. Defendant Lion began to manufacture, market and sell turnout gear in 1970. Since its founding, and continuing through to the present, Lion makes, markets and sells turnout gear using PFAS-containing fabrics, including Teflon® F-PPE-treated thermal lining material supplied by Defendants DuPont's NOMEX® PFAS-containing flame/water/oil-resistant fabric, and moisture barrier fabrics supplied by Defendant Gore.[24]

62. Defendant Honeywell acquired Norcross Safety Products LLC in 2008, entering the protective gear industry and becoming one of the leading manufacturers of turnouts. Honeywell makes, markets and sells turnout gear using PFAS-containing fabrics, supplied by Defendants DuPont, Gore, PBI and StedFast.

**D. Defendants Know Exposure to PFAS Cause Serious Health Impacts**

63. Defendants, including specifically 3M and DuPont, have long known about the serious and significant impacts to health caused by exposure to PFAS, having conducted study after study on the exposure and health effects of PFAS on animals, and in some cases, even on their own employees. The findings of these studies were discussed within the companies internally, yet were never made public or shared with any regulatory agencies. Among the findings:

    a. A 1950 3M study showed that PFAS could build up in the blood of mice and that PFAS could bind to proteins in human blood suggesting that PFAS

---

[23] *See Globe History*, Globe MSA Safety Website, (last visited September 26, 2023), https://globe.msasafety.com/history; *Turnout Gear Materials*, Globe MSA Safety Website, (last visited September 26, 2023), https://globe.msasafety.com/materials.
[24] *See Our History*, Lion Website (last visited September 26, 2023), http://www.lionprotects.com/lion-history; *Firefighter Turnouts*, Lion Website (last visited September 26, 2023), https://www.lionprotects.com/firefighter-turnout-gear#.

would not only remain, but also persist and accumulate in the body of the exposed individuals with each additional exposure.[25]

b. In 1961, a DuPont toxicologist warned that PFAS chemicals enlarge rat and rabbit livers.[26] A year later, these results were replicated in studies with dogs.[27]

c. In 1963, 3M's technical handbook classified PFAS as toxic and advised that "due care should be exercised in handling these materials."[28]

d. In the 1970s, DuPont discovered that there were high concentrations of PFOA in the blood samples of factory workers at DuPont's Washington Works site.[29]

e. By the end of the 1970s, studies performed by, at least 3M, indicated that PFAS materials were resistant to environmental degradation and would persist in the environment.[30]

f. In 1981, 3M, which still supplied PFOA to DuPont and other corporations, found that ingestion of PFOA caused birth defects in rats. 3M reported this information to DuPont. DuPont then tested the children of pregnant employees in their Teflon division and found that of seven births, two children had eye defects. Defendants reassigned the female employees, but did not inform the EPA or make this information public.[31]

g. In 1988, a company that purchased PFAS firefighting foam complained to 3M because the product was not biodegradable as 3M represented.[32]

---

[25] Timeline - *For 50 Years, Polluters Knew PFAS Chemicals Were Dangerous But Hid Risks From Public*, Environmental Working Group, (2019), https://static.ewg.org/reports/2019/pfa-timeline/3M-DuPont-Timeline_sm.pdf; see also, https://www.ewg.org/pfastimeline/

[26] *Id.*

[27] Nathaniel Rich, *The Lawyer Who Became DuPont's Worst Nightmare*, New York Times (June 6, 2016), https://www.nytimes.com/2016/01/10/magazine/the-lawyer-who-became-duponts-worst-nightmare.html.

[28] *Id.* at fn. 25.

[29] *Id.*

[30] *PFCS: Global Contaminants: PFCs Last Forever*, Environmental Working Group, (April 3, 2003), https://www.ewg.org/research/pfcs-global-contaminants/pfcs-last-forever.

[31] *Id.* at fn. 25.

[32] *The Devil They Knew: PFAS Contamination and the Need for Corporate Accountability, Part II*, Transcript of Hearing Before the Subcommittee on Environment of the Committee on Oversight and Reform, House of Representatives (September 19, 2019), https://docs.house.gov/meetings/GO/GO28/20190910/109902/HHRG-116-GO28-Transcript-20190910.pdf.

Subsequently, a 3M employee wrote an internal memo that "3M should stop perpetrating the myth that these fluorochemical surfactants are biodegradable, but the company continued to sell them."[33]

h. By at least the end of the 1980s, research performed by Defendants, including specifically, Defendants 3M and DuPont, manufacturing and/or using PFAS materials indicated that at least one such PFAS material, PFOA, caused testicular tumors in a chronic cancer study in rats, resulting in at least Defendant DuPont classifying such PFAS material internally as a confirmed animal carcinogen and possible human carcinogen.[34]

i. In the 1990s, Defendant DuPont knew that PFOA caused cancerous testicular, pancreatic and liver tumors in lab animals. One study also suggested that PFOA exposure could cause possible DNA damage.[35] Another study of workers found a link between PFOA exposure and prostate cancer.[36]

j. In response to the alarming and detrimental health impact, DuPont began to develop an alternative to PFOA and in 1993, an internal memo announced that "for the first time, we have a viable candidate" that appeared to be less toxic and showed less bioaccumulation.[37] DuPont decided against using this potentially safer alternative, however, because products manufactured with PFOA were worth $1 billion in annual profit.[38]

k. On June 30, 2000, 3M and DuPont met to share 3M's "pertinent data on PFOA." 3M informed DuPont that the half-life of PFOA was much longer than animal studies showed.[39]

64. Additionally, approximately fifty years of studies by Defendants, including by 3M and DuPont, on human exposure to PFAS found unacceptable levels of toxicity and bio-accumulation, as well as a link to increased incidence of liver damage, various cancers, and birth defects in humans exposed to PFAS.[40] These studies also revealed that, once in the body, PFAS

---

[33] *Id.*

[34] *Id.* at fn. 25.

[35] *Id.*

[36] *Id.*

[37] *Id.*

[38] *Id.*

[39] Internal DuPont Memorandum, DuPont Haskell Laboratory Visit (June 30, 2000), https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1721.pdf.

[40] *Id.* at fn. 25.

has a very long half-life and that it takes years before even one-half of the chemicals begins to be eliminated from the body—assuming, of course, the body experiences no additional PFAS chemical exposure.[41]

65.     In the face of these findings, and despite passage of the Toxic Substances Control Act in 1976, which requires companies that manufacture, process or distribute chemicals to immediately report to the Environmental Protection Agency ("EPA") information that "reasonably supports the conclusion" that a chemical presents a substantial risk to health or the environment, Defendants did not inform the EPA, Decedent Griffin, or the public about the health impacts resulting from exposure to PFAS.[42] Indeed, in at least some instances, Defendants' own attorneys advised the companies to conceal their damaging findings on PFAS, which they did for decades.[43]

66.     In 2000, 3M announced that it would cease manufacturing a specific PFAS chemical, PFOS, on the same day the EPA announced that PFOA and PFOS, two chemicals in the PFAS family, had a "strong tendency to accumulate in human and animal tissues and could potentially pose a risk to human health and the environment over the long term."[44]

67.     However, 3M did not recall PFOS, its chemical feedstock that it had previously manufactured, sold, or distributed, or that was then stored at firehouses and being used by firefighters around the country. And, no other Defendant stopped manufacturing PFAS chemicals or products containing PFAS. Rather, Defendants continued to manufacture, develop, market, promote, distribute and sell PFAS chemicals and PFAS-containing products, including specifically

---

[41] *Id.*

[42] *Id.*

[43] *Id.* at fn. 34.

[44] *EPA and 3M Announce Phase Out of PFOS*, Press Release, United States Environmental Protection Agency (May 16, 2000), https://archive.epa.gov/epapages/newsroom_archive/newsreleases/33aa946e6cb11f35852568e10 05246b4.html.

PFAS-containing turnouts and did so without any warning to firefighters or to the public concerning the fact that these turnouts contained PFAS, or that they posed a serious health risk to human health. Defendants instead continued to claim their products were safe.

68.    By the 2000s, Defendants' own research of its employees revealed multiple adverse health effects among workers who had been exposed to PFAS, including increased cancer incidence, hormone changes, lipid changes, and thyroid and liver impacts.[45]

69.    In 2001, a class action lawsuit was filed in West Virginia against DuPont on behalf of people whose water had been contaminated by the nearby DuPont chemical plant where PFAS chemicals were manufactured.

70.    Defendants continued to manufacture, market, promote, distribute, and sell PFAS and PFAS-containing products, including turnouts, and continued to publicly claim that these products were safe. Defendants affirmatively suppressed independent research on PFAS, and instead commissioned research and white papers to support their claims that PFAS and PFAS-containing products were safe to use, engaging consultants to further this strategy and ensure that they would continue to profit from these toxic chemicals and products.

71.    As one consultant wrote in pitching its services to DuPont, it was critical that the PFAS industry develop an aggressive strategy to "[discourage] governmental agencies, Plaintiffs' bar and misguided environmental groups" and "[implement] a strategy to limit the effect of litigation and regulation on the revenue stream generated by PFOA." The strategy was further described by consultant as follows:

> DUPONT MUST SHAPE THE DEBATE AT ALL LEVELS. . . The outcome of this process will result in the preparation of a multifaceted plan to take control of the ongoing risk assessment by the EPA, looming regulatory challenges, likely litigation, and almost certain medical monitoring hurdles. The primary focus of this

---

[45] *Id.* at fn. 26.

endeavor is to strive to create the climate and conditions that will obviate, or at the very least, minimize ongoing litigation and contemplated regulation relating to PFOA. This would include facilitating the publication of papers and articles dispelling the alleged nexus between PFOA and teratogenicity as well as other claimed harm. We would also lay the foundation for creating Daubert precedent to discourage additional lawsuits.[46]

72.     Defendants also pivoted with a new industry strategy. Defendants continued to publicly represent that PFAS and/or products containing PFAS were safe, while developing newer, "short-chain" PFAS alternatives.

73.     In 2005, the EPA fined DuPont $16.5 million for failing to submit decades of toxicity studies of PFOA (one PFAS chemical manufactured by the company).[47] In the face of and undeterred by the EPA's action, Defendant turnout manufacturers, such as MSA (Globe) and Lion, partnered with DuPont and with Defendant Gore to develop, manufacture, market, distribute and turnouts made with DuPont's and/or Gore's PFAS-based textile coatings (e.g., Nomex® and Gore® Protective Fabrics).[48]

---

[46] Letter from P. Terrence Gaffney, Esq of The Weinberg Group to Jane Brooks, Vice President, Special Initiatives, DuPont de Nemours & Company, regarding PFOA (April 29, 2003).

[47] Michael Janofsky, *DuPont to Pay $16.5 Million for Unreported Risks*, New York Times (December 5, 2005), https://www.nytimes.com/2005/12/15/politics/dupont-to-pay-165-million-for-unreported-risks.html.

[48] *DuPont and LION Collaborate to Better Protect Firefighters and First Responders*, Press Release, DuPont and LION (January 30, 2013), https://www.firefighternation.com/leadership/dupont-and-lion-collaborate-to-better-protect-firefighters-2/#gref; Our Partners, Globe Website (last visited September 26, 2023), https://globe.msasafety.com/our-partners; and *Firefighter & Emergency Response Protection*, DuPont Website (last visited September 26, 2023), https://www.dupont.com/personal-protection/firefighter-protection.html.

74.    In 2006, the EPA "invited" eight PFOA manufacturers, including Defendants DuPont, 3M, Arkema, and Daikin to join in a "Global Stewardship Program" and phase out production of PFOA by 2015.[49]

75.    By this time, Defendants had begun to aggressively manufacture, market and/or distribute short-chain PFAS, such as Gen X, claiming that these alternative PFAS chemicals did not pose significant health risks to humans or the environment. But, these claims, too, were false. Defendants knew that certain of these short-chain PFAS chemicals had been found in human blood, and that at least one of them produces the same types of cancerous tumors (testicular, liver, and pancreatic) in rats as had been found in long-chain PFAS studies.[50]

76.    In 2011, a C8 Science Panel convened as part of a settlement in the West Virginia DuPont water contamination case described in paragraph 86, above, began releasing its findings. The Panel had analyzed the blood serum of nearly 70,000 residents living in the water contamination area for two long-chain PFAS (PFOA and PFOS), and found significant negative human health effects (including, kidney cancer, testicular cancer, ulcerative colitis, thyroid disease, high cholesterol and preeclampsia) associated with exposure to these PFAS chemicals in the area groundwater.

77.    In 2013, DuPont entered an agreement with the EPA and ceased production and use of PFOA – just one of thousands of PFAS chemicals the company makes, promotes and sells. Defendants, however, continued manufacturing short-chain PFAS materials, chemical feedstock,

---

[49] *PFOA Stewardship Program*, United States Environmental Protection Agency (last visited September 26, 2023), https://www.epa.gov/assessing-and-managing-chemicals-under-tsca/risk-management-and-polyfluoroalkyl-substances-pfas#tab-3.

[50] Sharon Lerner, *New Teflon Toxin Causes Cancer in Lab Animals*, The Intercept (March 3, 2016), https://theintercept.com/2016/03/03/new-teflon-toxin-causes-cancer-in-lab-animals/.

and products—all the while peddling them as safer, and as more easily bio-degraded than long-chain PFAS, despite evidence to the contrary.[51]

78.    In 2015, DuPont spun-off its PFAS chemicals business, as well two-thirds of its environmental liabilities and 90% of its active litigation, to Defendant Chemours. As part of the transaction, DuPont required Chemours to indemnify the "new" DuPont for all assigned environmental liabilities should a regulatory agency or plaintiff seek to hold the "new" DuPont accountable. As Chemours President Paul Kirsch testified before Congress: "DuPont designed the separation of Chemours to create a company where it could dump its liabilities to protect itself from environmental cleanup and related responsibilities."[52]

79.    In June 2018, the Agency for Toxic Substances and Disease Registry (ASTDR), a division of the Centers for Disease Control and Prevention at the US Department of Health and Human Services released an 852-page draft toxicology report analyzing scientific data about the most common PFAS chemical variants, finding that PFAS "are potentially more hazardous than previously known, are particularly concerning because of these compounds' persistence in the environment and widespread prevalence—PFAS are extremely slow to biodegrade."[53]

80.    In September 2019, DuPont chief operations and engineering officer Daryl Roberts testified before Congress that the "new DuPont" (to be distinguished from the "old DuPont" which manufactured and sold PFAS for decades before being spun-off to Chemours) no longer uses or manufactures PFAS and is no longer responsible for obligations and harms resulting from over 65

---

[51] *Id.* at fn. 17, *see* Tom Neltner http://blogs.edf.org/health/2019/02/20/potential-biopersistence-short-chain-pfas/.
[52] *Id.* at fn. 33.
[53] *A Toxic Threat: Government Must Act Now on PFAS Contamination at Military Bases*, Center for Science and Democracy (September 2018), https://www.ucsusa.org/sites/default/files/attach/2018/09/a-toxic-threat-pfs-military-fact-sheet-ucs-2018.pdf.

years of producing PFAS.[54] Roberts further testified that he knew nothing about "old DuPont's" efforts to suppress research on PFAS' toxicity as testified to by one of DuPont's former scientists only a few days earlier.[55] Finally, he stated that any liabilities from "old DuPont's" PFAS operations were now Chemours' problem because DuPont is essentially a completely new company with no past – only a bright future of doing good in the world.[56]

**E. Defendants Failed to Warn Plaintiff of the Dangers of Exposure to PFAS and Falsely Represented That Their PFAS Products Were Safe.**

81.    As alleged above, Defendants knew that PFAS are persistent, toxic, and bioaccumulating with very long half-life. They knew that exposure to PFAS can cause serious and life-threatening diseases, including cancer.

82.    Yet, Defendants **did not warn** Decedent Griffin that PFAS and Defendants' PFAS-containing turnouts used by Decedent Griffin, contained PFAS, or that exposure to PFAS in the normal and intended use of such products, causes serious bodily harm and illnesses, including cancer.

83.    Instead, Defendants falsely represented—and continue to falsely represent— that PFAS and PFAS-containing turnouts, are safe and not harmful to humans or the environment.

84.    Such assertions fly in the face of science and a global movement toward eliminating this class of chemicals from consumer products. In just these  past few years, for example, Congress passed legislation to address PFAS in turnouts.[57] The U.S. Food and Drug

---

[54] *Id.* at fn. 33.
[55] *Id.*
[56] *Id.*
[57] Ryan Woodward, *Congress Passes Legislation to Address PFAS Chemicals Impacting Firefighters*, Fire Rescue 1, (December 17, 2020), https://www.firerescue1.com/legislation-funding/articles/congress-passes-legislation-to-address-pfas-chemicals-impacting-firefighters-Sp8MFif5dAbD4ZrI/.

Administration similarly has called for phasing out of short-chain PFAS that contain 6:2 fluorotelomer alcohol (6:2 FTOH).[58] And private companies like Home Depot, Lowes and Staples recently have begun to discontinue selling products containing any PFAS, as have several outdoor, durable clothing companies (e.g., Columbia and Marmot), clothing retailers (e.g., H&M, Levi Strauss & Co), shoe companies (e.g., Adidas and New Balance), car seat manufacturers (e.g., Britax and Graco), furniture companies (e.g., IKEA), personal care companies (e.g. Johnson & Johnson and Oral-B), and textile manufacturing companies.[59]

### (1) Defendants Provide No Safety Warnings on Product Labels

85.    Plaintiff Griffin further alleges that turnouts containing PFAS or PFAS materials sold by Defendants in Virginia, and used by Decedent Griffin in training, emergency incidents, or in fire suppression during his firefighting career, also contained no warning that the turnouts contain PFAS or PFAS materials. Nor did these labels inform persons handling, wearing, or using the turnouts as they were intended to be handled, worn or used can result in exposure to PFAS and serious bodily harm.

86.    Below are pictures of warning labels for turnouts manufactured, marked, sold and distributed by Defendants MSA/Globe and Lion. As depicted below, the labels make no mention of PFAS, do not advise that the turnouts contain PFAS or PFAS materials, and contain no warning that handling, wearing, or using the turnouts as they were intended to be handled, worn or used

---

[58] *FDA Announces the Voluntary Phase-Out by Industry of Certain PFAS Used in Food Packaging*, U.S. Food and Drug Administration, July 31, 2020, https://www.fda.gov/food/cfsan-constituent-updates/fda-announces-voluntary-phase-out-industry-certain-pfas-used-food-packaging.

[59] Muhannad Malas, *Home Depot, Lowe's and Staples Take Action to Protect Their Customers from PFAS and Other Harmful Toxics Lurking in Carpets and Office Supplies*, Environmental Defence (November 5, 2019), https://environmentaldefence.ca/2019/11/05/home-depot-lowes-staples-protect-customers-toxics/; *PFAS-Free Products*, PFAS Central, (last visited September 26, 2023), https://pfascentral.org/pfas-free-products/.

can result in exposure to PFAS and serious bodily harm. Further, while the labels provide washing instructions, the instructions do not advise that turnouts should be washed in a commercial extractor to prevent cross-contamination and PFAS-exposure to family members who handle or wash the turnouts with other garments in home washing machines.





**Garment Safety Label**

## ⚠ DANGER

6150

You must read and understand these warnings and instructions.
Failure to follow these warnings and instructions will result in serious injury or death.

- Wear this garment ONLY FOR FIREFIGHTING ACTIVITIES.
- THIS GARMENT DOES NOT PROVIDE PROTECTION AGAINST CBRN TERRORISM AGENTS.
- Before wearing this garment, you must read and understand the User Instruction, Safety and Training Guide provided with this garment. The guide explains: 1. critical safety information and protective clothing limitations. 2. proper sizing/adjustment. 3. procedures for putting on and removing protective clothing. 4. how to clean, decontaminate, inspect and store this garment. 5. use consistent with NFPA1500. 6. limitations on useful life and retirement procedures.
- You should wear this garment only if you have been **properly trained in firefighting techniques**, and have knowledge of the proper selection, fit, use, care and limitations of protective clothing and equipment.
To obtain a free user guide, write Lion @7200 Poe Ave., Suite 400 Dayton, OH 45414 or call 1-800-421-2926.

- This garment provides limited protection against heat and flame. Minimize exposure to heat. You may be burned without warning or without receiving damage to garment. Avoid contact with hot objects. Skin burns occur when skin reaches a temperature of 118°F. Fires burn at temperatures up to 2000°F.
- **Moisture and/or compression in your garment may reduce protection.**
- Exertion in hot conditions **may result in heat exhaustion or poor judgment.** If you feel dizziness, dehydration, loss of focus, or shortness of breath, get to a safe area, remove this garment, and seek medical attention.
- **Do not use this garment if it is damaged or dirty**, garments will NOT provide the intended protection. ALWAYS follow manufacturer's cleaning instructions.
- **This garment has limited useful life.** You must inspect regularly and retire when appropriate according to the User Instruction, Safety and Training Guide See also NFPA 1851.

**DO NOT REMOVE OR WRITE ON THIS LABEL!**

**Garment Cleaning Label**

**Garment Information Label**

## ⚙ LION

6484

Questions, write or call immediately:
Lion
7200 Poe Ave., Suite 400 Dayton, OH 45414. 1-800-421-2926

**CLEANING AND STORAGE INSTRUCTIONS**
- Users must clean, inspect, maintain, store and alter only in accordance with the User Instruction, Safety and Training Guide.
- Never use chlorine bleach. Chlorine bleach will significantly compromise the protection afforded by textile and film materials utilized in the construction of this garment.
- For coats only, remove DRD and launder DRD by hand washing with mild detergent and warm water.
- Fasten all hooks and D-rings and turn inside out or place in a laundry bag.
- Machine wash, warm water, using only liquid detergent and if needed, liquid non-chlorine bleach. Double rinse in cool water. Never use fabric softeners.
- Never dry clean.
- Dry by hanging in open area, out of direct or indirect sunlight and fluorescent light.
- Store out of direct or indirect sunlight and fluorescent light.
THIS STRUCTURAL FIRE FIGHTING PROTECTIVE GARMENT MEETS THE GARMENT REQUIREMENTS OF NFPA1971, 2013 EDITION.
    PROTECTIVE GARMENT FOR STRUCTURAL FIRE FIGHTING IN ACCORDANCE WITH
    NFPA 1971-2013. 58F6
    When worn with the inner liner and outer shell assembled together, this garment meets the personal protective equipment criteria of US Dept. of Labor OSHA Bloodborne Pathogens Standard, Title 29 CFR, Part 1910.1030, and CAL-OSHA Standard Title 8 Section 3406.
Rev.1.0 12112     **DO NOT REMOVE OR WRITE ON THIS LABEL!**



**Janesville**
CROSSTECH MOISTURE BARRIER (PTFE)
GLIDE 2L ARAFLO E-89 (K) THERM.LINER
NOMEX E-89 QUILT
REQ:401971
MFG DATE:10/5/2012
CUT:104246AA006
MODEL:CVFM
LINER:C2K7CVFM
SIZE:4632R

0000652642

**Garment Liner Attachment Safety Label**

## ⚠ WARNING

FOR COMPLIANCE WITH THE STRUCTURAL FIRE FIGHTING GARMENT REQUIREMENTS OF NFPA 1971, THE FOLLOWING PROTECTIVE ITEMS MUST BE WORN IN CONJUNCTION WITH THIS GARMENT: OUTER SHELL 7.0 OZ MINIMUM WEIGHT

This INNER LINER alone does not provide protection against heat, flame, chemical or biological hazards. NEVER wear this INNER LINER without the SAME SIZE AND MODEL OUTER SHELL, as identified on labels located on each detachable component.

To reduce the risk of injury or death, you must assemble and wear together ALL of the following items:
1. protective coat and pant with outer shell, attached inner liner and DRD installed in coat 2. gloves 3. boots 4. helmet with eye protection 5. protective hood 6. SCBA 7. PASS device
ALWAYS make sure that all ensemble layers have the proper overlap and that all items fit with adequate looseness. Tight fit lowers insulation protection and restricts mobility.

MADE IN THE U.S.A.
**DO NOT REMOVE OR WRITE ON THIS LABEL!**     FI# 6151

**Drag Rescue Device (DRD) Label**

**(2) Defendants' Misrepresentations About PFAS Continue to this Day**

87.     Despite their decades of knowledge about PFAS and its dangers, Defendants continue to make false claims, continue to misrepresent the safety of PFAS, and continue to minimize and fail to warn about the hazards of exposure to PFAS, or turnouts made with or containing PFAS.

88.     Defendants' misinformation campaign is long-standing and continues to this day. Some pertinent examples include:

a. 2017 – Defendant Lion's President, Stephen Schwartz, wrote a letter to the editor of the Columbus Dispatch, expressing outrage at the assertion in a government filing that firefighters may have been exposed to PFAS through turnout gear. Schwartz called this assertion false, stating that Lion's turn-out gear is not treated or made with PFOS or PFOA:. "PFOAs and PFOSs have never been components of LION's turn-out gear, either as a coating or as a textile." He acknowledged that turn-out gear is treated with PTFE to provide a durable water repellant, and that the textile industry in the past had used PFOA as a processing aid to manufacture PTFE moisture barrier films and repellants. "It is possible that trace amounts may have been present as a residue when the films and finishes were incorporated into LION's turn-out gear. **However, based on all available scientific data, such nominal trace amounts, if they existed at all, would not have posed any health risk to firefighters. There is absolutely no connection at all between PFOS and firefighter turnout gear."** (Emphasis added).[60]

b. 2018 – The National Fire Protection Association issued a publication listing 11 ways to minimize risk of occupational cancer – the suggestions centered on wearing turnouts for protection resulting from combustion or spills, and cleaning turnouts after exposure to chemicals. There was not a single mention of the risks of wearing turnouts containing PFAS or PFAS-containing materials.[61]

c. 2019 – Defendant 3M Vice President, Denise Rutherford, testified before Congress that she **absolutely agreed with the statement that "the weight of current**

---

[60] Letter from LION president Stephen A. Schwartz to Ala D. Miller, Editor, The Columbus Dispatch (October 30, 2017), http://files.constantcontact.com/bf8abd7a001/01f5d727-d72e-42dc-971b-caa9c2855800.pdf.

[61] *11 Best Practices for Preventing Firefighter Cancer Outlined in New Report Put Out by VCOS and NVFC*, National Fire Protection Association Xchange (August 16, 2018), https://www.nfpa.org/News-and-Research/Publications-and-media/Blogs-Landing-Page/NFPA-Today/Blog-Posts/2018/08/16/11-best-practices-for-preventing-firefighter-cancer-outlined-in-new-report-put-out-by-vcos-and-nvfc

**scientific evidence does not show that PFOS or PFOA cause adverse health effects in humans at current rates of exposure."** (emphasis added)[62]

89.    As frequent sponsors and advertisers in fire service publications, Defendants have been so influential in the industry that fire service leadership have echoed these narratives.

90.    For example, in 2017, the International Association of Fire Fighters ("IAFF"), which represents more than 324,000 full-time professional firefighters, issued a statement that both mischaracterized and purported to state that the risks associated with exposure to PFAS and PFAS chemicals and materials in turnouts was minimal to non-existent. The statement even encouraged firefighters to continue to wear turnouts, creating a false sense that these PFAS-containing turnouts were safe. The statement reads, in relevant part:

> Importantly, PFOA use has been almost completely phased out in the US….. If PFOA is a combustion product of PFOA-containing consumer products made prior to phasing out use of this chemical, fire fighters will be exposed in fire suppression activities. However, the data are too limited at present to determine this. PFOA is unlikely to be a component in recently US manufactured turnout gear. However, if PFOA is a combustion product, it may be present as a contaminant on turnout gear. PFOA may also be present as a manufactured component of legacy turnout gear….The exposure contribution from any such PFOA content is likely to be minimal since volatilization from the manufactured product would be required….**At this time, IAFF does not recommend that legacy turnout gear be replaced outside of its lifecycle. Fire fighters wishing to minimize PFOA exposure should continue to wear their PPE…and regularly decontaminate their turnout gear.** IAFF will continue to monitor developments and update this fact sheet should new information become available.[63]

91.    The IAFF maintained the Defendants' position that the turnout gear was safe until new leadership took over in 2021. Because of these and other false claims and misrepresentations on the part of Defendants, the Decedent Griffin did not know and, in the exercise of reasonable

---

[62] Gabe Schneider, 3M Grilled over PFAS Chemicals at Congressional Hearing, MinnPost (September 11, 2019), https://www.minnpost.com/national/2019/09/3m-grilled-over-pfas-chemicals-at-congressional-hearing/.
[63] *Statement on PFOA and Turnout Gear*, International Association of Firefighters, (May 2017), https://tinyurl.com/y29mfh69.

diligence, could not have known that the turnouts he used contained PFAS or PFAS-containing materials, and caused Decedent Griffin to be exposed to PFAS and/or PFAS-containing materials, leading to his brain cancer and eventual death on October 1, 2021.

92.    Also, in January 2021, Defendants DuPont and Chemours along with Corteva (the agricultural unit of DuPont that it spun off in 2019) announced a cost-sharing agreement worth $4 billion to settle lawsuits involving the historic use of PFAS – thereby acknowledging, at long last, the significant harm their PFAS chemicals have caused to human health and the environment.

**F.  New Research Indicates That Firefighters are at Significant Risk of Harm From Exposure to PFAS in Turnouts — But Defendants Continue to Discount or Deny These Risks**

93.    In June 2020, scientists at the University of Notre Dame published a ground-breaking study on PFAS in turnout gear, and the exposure risks posed to firefighters that wear, wore, or handle such gear ("Notre Dame Turnout Study"). The Notre Dame Turnout Study analyzed over 30 sets of used and unused (still in their original packaging) turnout gear made by six U.S. manufacturers, including Defendants MSA/Globe, Lion and Honeywell over several production years, as listed below:[64]

| PPE gear manufacturers sampled: | # samples |
| --- | --- |
| Globe Manufacturing (Pittsfield MA), | 11 |
| Lion Group (Dayton OH), | 12 |
| Honeywell First Responder (Dayton, OH), | 2 |
| Lakeland Fire (Decatur, AL) | 2 |
| Quest Fire Apparel (Saratoga Springs, NY) | 1 |
| Quaker Safety (Quakertown, PA) | 2 |

The type and number of turnout gear samples used in this study.

94.    The Notre Dame Turnout Study noted that these manufacturers' turnout gear (or personal protective equipment-PPE, as it is described in the study) are manufactured "from textiles

---

[64] *Id.* at fn. 5.

that are made from fluoropolymers (one form of PFAS) or extensively treated by PFAS in the form of side-chain fluoropolymers."[65] According to the researchers, "[t]hese PFAS include fluoropolymer materials such as PTFE used as a moisture barrier in the inner layers of turnout gear."[66] The study found significant levels of PFAS chemicals – including PFOA, PFOS, PFBA, PFPeA, PFHxA, PFHpA, PFNA, PFDA, PFUnA, PFDoA, PFTrDA, PFToDA, PFBS, PFOSA, N-EtFOSA, MeFOSAA, N-MeFOSE, N-EtFOSE and 6:20FTS – in both new and used turnout gear, and across layers, portions, and materials in the turnout gear, including in material layers that are not intentionally treated with PFAS by the manufacturer, thereby providing "the first evidence that suggests PFAS appear to migrate from the highly fluorinated layers and collect in the untreated layer of clothing worn against the skin."[67]

95.     These findings suggest that, as the garments are worn, PFAS from the outer shell and the moisture barrier can migrate from the turnouts and contaminate both the firefighter, their apparatus and workplace with PFAS. The analysis also indicated that fluoropolymers from the outer layer decompose into other PFAS, including PFOA.

---

[65] *Id.* at p. A.
[66] *Id.*
[67] *Id.* at p. C.

Environmental Science & Technology Letters    pubs.acs.org/journal/estlcu    Letter

**Table 2. Quantities of Target PFAS (in ppb) Found in US Turnout Gear by LC–MS/MS Analysis**

| values in ppb | jacket 2008 unused | | | parts 2014 used | | | jacket 2008 used | jacket 2017 unused |
| | thermal liner | moisture barrier | outer shell | thermal liner | moisture barrier | outer shell | moisture barrier | moisture barrier |
|---|---|---|---|---|---|---|---|---|
| PFBA | <MDL | 12.8 | 10.6 | 1.39 | 6.15 | 21.5 | 20.5 | 9.51 |
| PFPeA | <MDL | 12.6 | 17.8 | 2.28 | 10.6 | 16.4 | 12.1 | 2.46 |
| PFHxA | <MDL | 36.5 | 36.9 | 1.99 | 28.6 | 10.9 | 35.8 | 36.9 |
| PFHpA | <MDL | 13.4 | 25.4 | 1.05 | 5.82 | 2.23 | 14.5 | 25.4 |
| PFOA | 78 | 46 | 182 | 850 | 71 | 97 | 37 | <MDL |
| PFNA | 2.63 | <MDL | 8.2 | 25.3 | 1.95 | <MDL | 2.76 | <MDL |
| PFDA | 2.98 | 6.51 | 5.51 | 133 | <MDL | <MDL | 23.7 | <MDL |
| PFUnA | <MDL | <MDL | <MDL | 7.96 | <MDL | <MDL | 2.51 | <MDL |
| PFDoA | <MDL | 5.01 | <MDL | 68.6 | <MDL | <MDL | 25.9 | <MDL |
| PFBS | 28.3 | 140 | 142 | 53 400 | 47 900 | 1050 | 230 | 90 400 |
| PFOS | <MDL | <MDL | <MDL | 7 | <MDL | <MDL | 2 | <MDL |
| 6:2 FTS | <MDL | <MDL | <MDL | 25.9 | 129 | <MDL | <MDL | <MDL |
| 8:2 FTS | <MDL | <MDL | <MDL | 1.1 | <MDL | <MDL | <MDL | <MDL |

96.     "Startlingly," researchers reported, "garment to hand transfer of total fluorine in the ppm range was also observed when researchers simply manipulated the textiles in [the] laboratory."[68] The accumulation of PFAS on researchers' hands strongly suggests that transference of ppm levels of PFAS can occur merely by handling the turnouts and that PFAS exposure pathways include inhalation, ingestion and/or absorption (through dermal contact) – all of which DuPont internally acknowledged as being toxic in 1980. Such exposure pathways are a concern not only for firefighters that rely on turnouts to protect them from heat, fire, water and chemical hazards in the field, but to family members who may be exposed to the PFAS in turnouts as the result of home washing or storage. Lead researcher Graham Peaslee commented that turnouts are "the most highly fluorinated textiles I've ever seen"[69] and that the level of PFAS in the turnout

---

[68] *Id.*

[69] Raleigh McElvery, *Protective Gear Could Expose Firefighters to PFAS*, Chemical and Engineering News (July 1, 2020), https://cen.acs.org/environment/persistent-pollutants/Protective-gear-expose-firefighters-PFAS/98/i26

gear means that firefighters are "swimming in a sea of [PFAS]. Those numbers for scientists are scarily high..."[70]



Credit: *Environ. Sci. Technol. Lett.*

Over time, PFAS in a firefighter's turnout gear can migrate from a moisture barrier (orange) into a thermal liner that contacts skin. PFAS can also be shed from an outer shell (black) into the environment.

97.      Despite these findings, Defendants have been quick to mischaracterize, dismiss or downplay the significance of the Notre Dame Turnout Study. Defendant MSA/Globe, when contacted about the study and asked whether Globe planned to study this issue and find an alternative to PFAS for turnouts, merely responded thusly: "[P]rotecting (firefighters) is Globe's business; every piece of our turnout gear meets or exceeds applicable industry standards."[71]

---

[70] Andrew Wallender, *Firefighters Face New Possible Risk From Toxic PFAS: Their Gear*, Bloomberg Law (June 23, 2020), https://news.bloomberglaw.com/pfas-project/firefighters-face-new-possible-risk-from-toxic-pfas-their-gear.

[71] Blair Miller, *Local Firefighters Concerned About Potentially Dangerous Chemicals on Gear*, Boston 25 News (February 26, 2019), https://www.boston25news.com/news/local-firefighters-facing-concerns-over-potentially-dangerous-chemicals-on-gear/925236612/

98.     Defendant Lion's responses have been similar and have also dismissed or minimized the significance of the Notre Dame Turnout Study's findings. Lion issued a Customer Safety Alert for PFOA and Turnout Gear stating: "Your LION turnout gear continues to be safe and ready for action especially when properly maintained. It is extremely important that firefighters continue to wear and properly care for their gear to stay safe on the job."[72]

99.     The Customer Safety Alert goes on to stress that Lion does not use PFOA or PFOS (two long-chain PFAS chemicals) in its turnouts.[73] It does not, however, address that the maker's turnouts in fact contain other PFAS chemicals, nor warn firefighters or the public about health harms associated with exposure to these toxic, bio-accumulating chemicals.

**HERE'S ALL YOU NEED TO KNOW ABOUT PFOA AND YOUR TURNOUT GEAR.**

**What is PFOA and why are we talking about it?**

**Perfluorooctanic Acid (PFOA) is a chemical that until recently was used in the process to make many different industrial chemicals and products.** The manufacture and use of PFOA was mostly phased out by major chemical companies by 2010. By 2015, its manufacture was eliminated in the United States.

In the firefighting protective clothing industry, PFOA was used as a processing agent in the manufacture of resins used to make PTFE films – the primary component of the moisture barrier used in turnout gear. While most residual PFOA was eliminated from the manufacturing process of PTFE, some tiny trace amounts remained.

LION does not use PFOA or PFOS in our turnout gear or any of our protective products.

PFOS has never been a component of turnout gear. PFOS health and environmental concerns are largely related to AFFF foams and are not connected to turnout gear.

100.     Defendant Lion's paid consultant, Dr. Paul Chrostowski, also has taken aim at the Notre Dame Turnout Study and its findings. Refuting a Fire Rescue magazine article about the study,[74] Chrostowski repeated Lion's website statement that "PFOA was never part of the gear

---

[72] LION Customer Safety Alert – PFOA and Turnout Gear (April 24, 2019), https://www.fireengineering.com/wp-content/uploads/2020/09/pfoa-lion.pdf.
[73] *Id.*
[74] Larissa Conroy, *What If I Told You That Your Bunker Gear Was Causing Cancer?*, Fire Rescue (May 28, 2020), https://www.firefighternation.com/firerescue/what-if-i-told-you-that-your-bunker-gear-was-causing-cancer/#gref

itself and frequent independent testing has found only trace amounts of it in any of the gear – not nearly enough to cause concern, and in amounts similar to consumer products."[75] Chrostowski went on to say "[t]he fact is that one may find trace amounts of 'short-chain' PFAS such as PFBS and PFHxA in firefighting textiles, but the scientific research shows that these materials are far less toxic than even PFOA and at the tiny trace levels the risk are extremely low based on numerous credible published scientific research papers."[76] Finally, Chrostowski falsely stated that the link between PFAS exposure and cancer is "extremely weak."[77]

101.    And yet, Lion concedes that dermal absorption is a pathway of exposure to cancer causing chemicals for firefighters. In a *Not in Our House* cancer awareness fact sheet that currently appears on the company's website, Lion warns firefighters: "For every 5 degree increase in temperature, skin becomes 400% more absorbent. The hotter you are, the more carcinogens your skin absorbs.[78] This statistic is alarming given that the core body temperature of firefighters routinely increases during firefighting activities while wearing turnouts which contain known carcinogens.[79]

---

[75] Paul Chrostowski, Ph.D., QEP, *Research and Independent Testing Shows Firefighters' Turnout Gear Remains Safe Despite Claims*, Fire Rescue (June 3, 2020). https://www.firefighternation.com/health-safety/research-and-independent-testing-shows-firefighters-turnout-gear-remains-safe-despite-claims/#gref
[76] *Id.*
[77] *Id.*
[78] LION website, https://cdn2.hubspot.net/hubfs/3475623/NOT%20IN%20OUR%20HOUSE%20Tip%20Sheet_Infographic%20(02-02-19).pdf  (last visited September 26, 2023).
[79] Nancy Espinoza, *Can We Stand the Heat?*, Journal of Emergency Medical Services, (April 30, 2008), https://www.jems.com/operations/can-we-stand-heat-study-reveal/; Gavin P. Horn, et al., *Thermal Response to Firefighting Activities in Residential Structure Fires: Impact of Job Assignment and Suppression Tactic*, Ergonomics (July 31, 2017), https://tinyurl.com/4j2mz7f7.



102.    The IAFF holds a yearly cancer summit and yet has done little to address the PFAS in turnouts.[80]  Defendants, including at least DuPont, Gore, Lion and MSA (Globe), have been regular sponsors of the IAFF Cancer Summit.

---

[80] As alleged above, in para. 119, IAFF has only recently begun to take action related to PFAS exposure due to pressure from its firefighter members. At the IAFF Annual Meeting in January 2021, two groundbreaking PFAS-related firefighter safety resolutions passed with the support of 99% of the membership. The resolutions require IAFF to: (1) sponsor independent testing of turnouts for PFAS and PFAS-related hazards, (2) oppose the use of PFAS and PFAS-containing



103.    At this event, as well as in firefighter cancer-related publications, programs and events, Defendants repeatedly used the summit as an opportunity to push the narrative that incidence of cancer among firefighters is attributable either to *other chemicals* encountered in the line of duty, or firefighters' failure to wash their turnouts after every call. Not once have the turnout Defendants admitted that the PFAS materials in their products has been found to be carcinogenic, and that the very equipment that should be protecting firefighters are causing the most harm. Further, Lion's recently launched "Not in Our House" cancer awareness program is sadly ironic in that it encourages *firefighters to make a pledge* ("I will make every effort to protect myself and my team by doing my part to take precautions that will minimize the risk of exposure to

---

materials in turnouts, (3) require manufacturers to cease using PFAS in their firefighting products (4) identify which manufacturers will not cease using PFAS, (5) issue an advisory to fire departments to stop sending used or old turnouts to communities that are not able to buy new gear and instead provide grants to purchase new gear, and (6) cease accepting financial sponsorships from any PFAS/chemical-related companies unless it is to purchase PFAS-free turnout gear. Andrew Wallender, *PFAS Resolutions Overwhelmingly Approved by Firefighters' Union*, Bloomberg Law (February 1, 2021), https://news.bloomberglaw.com/daily-labor-report/pfas-resolutions-overwhelmingly-approved-by-firefighters-union; San Francisco Firefighters Cancer Prevention Foundation, (last visited September 30, 2021), https://www.sffcpf.org/resolutions-to-protect-members-from-toxic-substances-in-ppe/.

carcinogens that may lead to cancer…") while refusing to take any responsibility for continually exposing firefighters to carcinogens in their protective gear.[81]

104.    Decedent Griffin deserved more. He and his fellow firefighters are the first to respond to emergencies faced by their community, and never hesitate to help. Whether delivering a baby, responding to a fire, medical emergency, accident, mass shooting, terrorist attack, natural disaster, or teaching kids about fire safety, they always put the community first. When a child is drowning in a pool or a family is caught in a burning house, firefighters do not stop to calculate whether they will benefit by doing the right thing. They are true public servants. They step in and do what is needed when it is needed the most. Their health, safety and well-being must be of the highest priority.

### COUNT I | BREACH OF IMPLIED WARRANTIES

105.    This cause of action is asserted against all Defendants.

106.    Plaintiff Griffin incorporates by reference all allegations asserted in this Complaint.

107.    Each Defendant, their predecessors-in-interest, and/or their alter egos, and/or entities they have acquired, have engaged in the business of manufacturing, distributing, supplying, testing, labeling, promoting, or advertising of turnouts and through that conduct have knowingly placed PFAS-containing turnouts into the stream of commerce with full knowledge that they were sold to firefighters, fire departments, or to companies that sold turnouts to fire departments for use by firefighters such as Decedent Griffin, who was exposed to PFAS through ordinary and foreseeable uses for the purpose of firefighting activities and training.

---

[81] Rachel Zoch, *Take A Pledge To Stop Cancer At the Door*, Fire Rescue 1 (January 28, 2019), https://www.firerescue1.com/fire-products/personal-protective-equipment-ppe/articles/take-apledge-to-stop-cancer-at-the-door-e8bn7uAbtIXWdQau/.

108.    Defendants intended that the turnouts they were manufacturing, selling, distributing, supplying, promoting, and or selling would be used by firefighters, including Decedent Griffin, without any substantial change in the condition of the products from when it was initially manufactured, sold, distributed, and marketed by Defendants. Turnouts were not safe for use by firefighters even when used as directed by the manufacturer and for its intended purpose for firefighting activities which include training, extinguishment, ventilation, search-and-rescue, salvage, containment, and overhaul.

109.    Further, knowing of the dangerous and hazardous properties of turnouts, Defendants could have manufactured, marketed, distributed, and sold alternative designs or formulations of turnouts that did not contain PFAS.

110.    These alternative designs and/or formulations were already available, practical, similar in cost, and technologically feasible.

111.    The use of these alternative designs would have reduced or prevented the reasonably foreseeable harm to Decedent Griffin that was caused by the Defendants' manufacture, marketing, and sale of PFAS-containing turnouts.

112.    Additionally, the turnouts that were designed, manufactured, marketed, tested, advertised, promoted, sold, and distributed by the Defendants contained PFAS or PFAS-containing materials that were so toxic and unreasonably dangerous to human health and the environment, with the toxic chemicals being so mobile and persistent, that the act of designing, formulating, manufacturing, marketing, distributing, and selling these products was unreasonably dangerous under the circumstances.

113.    The turnouts designed, manufactured, marketed, tested, advertised, marketed, promoted, sold and distributed by the Defendants were dangerous and defective in design or

formulation because, at the time in which the products left the hands of the manufacturer or distributors, the foreseeable risks exceeded the benefits associated with the design or formulation of turnouts.

114.    The turnouts designed, manufactured, marketed, tested, advertised, marketed, promoted, sold, and distributed by the Defendants were dangerous and defective in design or formulation because, when the PFAS-containing products left the hands of the manufacturer or distributors, said products were unreasonably dangerous, unreasonably dangerous in normal use, and were more dangerous than an ordinary consumer-firefighter would expect.

115.    The turnouts were in a defective condition and unsafe, and Defendants knew or had reason to know that these PFAS-containing turnouts were defective and unsafe, especially when used in the form and manner as provided by Defendants. In particular, Defendants PFAS-containing products were defective in the following ways:

 a. When placed in the stream of commerce, Defendants' PFAS-containing turnouts were defective in design and formulation and as a result failed to meet ordinary users' expectations as to their safety and failed to perform as an ordinary user would expect.

 b. When placed in the stream of commerce, Defendants' PFAS-containing turnouts were defective in design and formulation, and as a result, dangerous to an extent beyond which an ordinary consumer-firefighter would anticipate.

 c. When placed in the stream of commerce, Defendants' PFAS-containing turnouts were unreasonable dangers in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

d. When placed in the stream of commerce, Defendants' PFAS-containing turnouts contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated manner.

e. When placed in the stream of commerce, Defendants' PFAS-containing turnouts did not provide an adequate warning of the potential harm that might result from exposure to PFAS and/or emitted from the turnouts and, alternatively, did not have adequate instructions for safe use of the products.

f. Exposure to PFAS presents a risk of grave and harmful side effects and injuries that outweigh any potential utility stemming from their use;

116. Defendants knew or should have known at the time of manufacturing, selling, distributing, promoting or marketing their PFAS-containing turnouts that exposure to PFAS could result in cancer and other grave and serious illnesses and injuries as alleged herein.

117. The foreseeable risk of harm could have been reduced or eliminated by the adoption of a reasonable, alternative design that was not unreasonably dangerous.

118. Decedent Griffin used these PFAS-containing turnouts in the ways that Defendants intended them to be used.

119. Decedent Griffin used these PFAS-containing turnouts in ways that were foreseeable to Defendants.

120. Decedent Griffin was exposed to PFAS by using Defendants' turnouts in the course of his employment, as described above, without knowledge of turnouts' dangerous propensities.

121. The design defect in turnouts containing PFAS exposed Decedent Griffin to toxic levels of PFAS and therefore, was a substantial factor in causing Decedent Griffin's injuries and death as described herein.

122.    Through the use of advertising and marketing, Defendants, by and through their agents, employees, officers, representatives, and others for whom they are legally responsible, directed the attention of the public, including the Plaintiff, to their products by means of implied representations, statements, and descriptions that the PFAS-containing turnouts they were manufacturing, selling, distributing, supplying, and/or promoting were safe for use and free from hazards or dangerous properties in their ordinary uses and in the manner directed and for the purposes intended by the Defendants, which became a part of the basis of the bargain.

123.    In using the PFAS-containing turnouts designed manufactured, sold, distributed, supplied, and/or promoted by the Defendants, the Plaintiff relied upon the skill and judgment of the Defendants, upon implied warranties of merchantability and fitness for a particular purpose that the PFAS-containing turnouts were safe and fit for their intended and foreseeable functions for which they were designed without causing the injuries of which Plaintiff complains as a result of probable, foreseeable, and ordinary uses of the product.

124.    At all times mentioned herein, the Defendants implied warranties of merchantability and fitness for a particular purpose in that the PFAS-containing turnouts designed, manufactured, sold, distributed, supplied, and/or advertised were unreasonably dangerous for their ordinary use and other reasonably foreseeable uses/purposes at the time they left Defendants' possession.

125.    As a direct and proximate result of the foregoing acts and omissions, Decedent Griffin suffered the injuries and damages described herein.

126.    Defendants acted with willful or conscious disregard for the rights, health, and safety of Decedent Griffin, as described herein, thereby entitling Plaintiff Griffin to an award of punitive damages.

## COUNT II | BREACH OF EXPRESS WARRANTIES

127.    This cause of action is asserted against all Defendants.

128.    Plaintiff Griffin incorporates by reference all allegations asserted in this Complaint.

129.    Each Defendant, their predecessors-in-interest, and/or their alter egos, and/or entities they have acquired, have engaged in the business of manufacturing, distributing, supplying, testing, labeling, promoting, or advertising of turnouts containing PFAS or PFAS-containing materials therein and, through that conduct, have knowingly placed PFAS-containing products into the stream of commerce with full knowledge that they were sold to fire departments, firefighters, or to companies that sold turnouts to fire departments for the use by firefighters such as Decedent Griffin, who was exposed to PFAS through ordinary and foreseeable uses for the purpose of firefighting activities and training.

130.    The products complained of were manufactured, designed, sold, supplied and/or distributed by each of the Defendants and he was exposed to PFAS while using turnouts in the ordinary course and as part of performing his duties as a firefighter.

131.    Defendants expected that the PFAS-containing turnouts they were manufacturing, selling, distributing, supplying, and/or promoting would reach firefighters, including Decedent Griffin, without any substantial change in the condition of the products from when it was initially manufactured, sold, distributed, and marketed by Defendants.

132.    Defendants knew or should have reasonably known that the manner in which they were manufacturing, marketing, and selling turnouts containing PFAS was hazardous to human health.

133.    The potential risks of using PFAS-containing turnouts presented a substantial danger to firefighters, including Decedent Griffin, when the turnouts were used or worn in an intended or reasonably foreseeable way.

134.    Decedent Griffin wore turnouts in the intended or reasonably foreseeable way in the ordinary course of performing his duties as a firefighter.

135.    The turnouts manufactured, marketed, and sold by the Defendants were dangerous and defective because the foreseeable risk of harm could have been reduced or eliminated by the adoption of a reasonable, alternative design that was not unreasonably dangerous.

136.    Defendants' products were in a defective condition and unreasonably dangerous, in that turnouts which, by design, contain PFAS or PFAS-containing products, were deleterious, toxic, and highly harmful to Decedent Griffin.

137.    Defendants knew or should have reasonably known that exposure to PFAS was hazardous to human health, but:

a.   Did not provide an adequate warning of the potential harm that might result from exposure to PFAS or PFAS-containing materials in turnouts;

b.   Did not have adequate instructions for safe use of the products;

c.   Did not have warnings to persons, such as Decedent Griffin, who had been, or reasonably may have been, exposed to Defendants' turnouts, of their disease potential, the proper steps to take to reduce the harmful effects of previous exposure, the need to have periodic medical examinations including the giving of histories which revealed the details of the previous exposure, and the need to have immediate and vigorous medical treatment for all related adverse health effects;

d. Did not manufacture, market, promote, distribute or sell reasonably comparable products not containing PFAS when it became feasible to design.

138. At the time of manufacture, distribution, promotion, labeling, distribution, and/or sale, Defendants could have provided warnings or instructions regarding the full and complete risks of turnouts containing PFAS, because Defendants knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

139. At all relevant timed, Defendants' turnouts did not contain an adequate warning or caution statement, which was necessary.

140. Decedent Griffin was unaware of the defective and unreasonably dangerous condition of Defendants' PFAS-containing turnouts at a time when such products were being used for the purposes for which they were intended, and Decedent Griffin was exposed to PFAS released from the Defendants' turnouts.

141. Decedent Griffin did not and could not have known that the use of turnouts in the ordinary course of performing his duties as a firefighter could be hazardous to his health, bio-accumulate in the blood, and cause serious health effects, including cancer.

142. Defendants knew that the use of turnouts, even when used as instructed by Defendants, subjected Decedent Griffin and others to a substantial risk of harm and yet, failed to adequately warn Decedent Griffin, the EPA or the public.

143. As a result of their inadequate warnings, Defendants' turnouts were defective and unreasonably dangerous when they left the possession and/or control of Defendants, were distributed by Defendants, and used or worn by Decedent Griffin.

144. The lack of adequate and sufficient warnings was a substantial factor in causing Decedent Griffin harm and death, as described herein.

145.    Through the use of such advertising and marketing, Defendants, by and through their agents, employees, officers, representatives, and others for whom they are legally responsible, directed the attention of the public, including the Plaintiff, to their products by means of express and implied representations, statements, and descriptions that the PFAS-containing products they were manufacturing, selling, distributing, supplying, and/or promoting were safe for use and free from hazards or dangerous properties in their ordinary uses and in the manner directed and for the purposes intended by the Defendants, which became a part of the basis of the bargain.

146.    In using the PFAS-containing turnouts designed manufactured, sold, distributed, supplied, and/or promoted by the Defendants, the Plaintiff relied upon the skill and judgment of the Defendants, upon implied warranties of merchantability and fitness for a particular purpose that the PFAS-containing turnouts were safe and fit for their intended and foreseeable functions for which they were designed without causing the injuries of which Plaintiff complains as a result of probable, foreseeable, and ordinary uses of the product.

147.    At all times mentioned herein, the Defendants breached express warranties in that the PFAS-containing turnouts designed, manufactured, sold, distributed, supplied, and/or advertised were defective and unreasonably dangerous for their ordinary use and other reasonably foreseeable uses/purposes at the time it left Defendants' possession contrary to express representations made by Defendants regarding the PFAS-containing turnouts safety and or lack of or absence of harmful substances such as PFAS.

148.    As a direct and proximate result of the foregoing acts and omissions, Decedent Griffin suffered the injuries and damages described herein.

149.    Defendants acted with willful or conscious disregard for the rights, health, and safety of Decedent Griffin, as described herein, thereby entitling Plaintiff Griffin to an award of punitive damages.

## COUNT III | NEGLIGENCE, GROSS NEGLIGENCE, RECKLESSNESS AND WILLFUL AND WANTON MISCONDUCT

150.    This cause of action is asserted against all Defendants.

151.    Plaintiff Griffin incorporates by reference all allegations asserted in this Complaint.

152.    Defendants owed a duty of care towards Decedent Griffin that was commensurate with the inherently dangerous, harmful, injurious, bio-persistent, environmentally-persistent, toxic, and bio-accumulative nature of turnouts containing PFAS or PFAS-containing materials.

153.    Defendants had a duty to exercise reasonable care in the design, research, testing, manufacture, marketing, formulation, supply, promotion, sale, labeling, training of users, production of information materials, use and/or distribution of turnouts into the stream of commerce, including a duty of care to ensure the PFAS did not infiltrate, persist in, accumulate in the blood and/or body of Decedent Griffin and including a duty to assure their products would not cause users to suffer unreasonable, dangerous side effects.

154.    Defendants had a duty to exercise reasonable care to ensure that turnouts were manufactured, marketed, and sold in such a way as to ensure that the end users were not exposed to the likely harm posed by PFAS and/or in such a way as to ensure that the end users were aware of the potential harm PFAS can cause to human health, and were advised to use it in such a way that would not be hazardous to their health.

155.     Defendants had a duty to warn of the hazards associated with PFAS and PFAS-containing materials and were in the best position to provide adequate instructions, proper labeling, and sufficient warnings about the turnouts. However, Defendants knowingly elected not to do so.

156.     Defendants failed to exercise ordinary care in the designing, researching, testing, manufacturing, formulating, marketing, testing, promotion, supply, sale, and/or distribution of their PFAS chemicals and PFAS-containing turnouts in the regular course of business, in that Defendants knew or should have known that use and exposure to PFAS and PFAS-containing turnouts and materials therein were hazardous to human health and created a high risk of unreasonable, dangerous side effects, including but not limited to severe personal injuries, as described herein.

157.     Defendants also knew or should have known that the manner in which they were manufacturing, marketing, distributing, and selling PFAS to be used in turnouts and PFAS-containing turnouts was hazardous to human health, bio-accumulated in the blood, and caused serious health effects, including cancer.

158.     Defendants negligently and deceptively underreported, underestimated, downplayed the serious health dangers of the PFAS-containing turnouts.

159.     At all times material, Decedent Griffin inhaled, ingested and/or absorbed dermally hazardous PFAS contaminants released from the Defendants' turnouts.

160.     Decedent Griffin's exposure to Defendant's turnouts, which were connected to and incidental to Defendants' manufacture, design, sale, supply and/or distribution of its PFAS-containing turnouts, was harmful and substantially increased the risk of injuries to Decedent Griffin and did cause injuries to Decedent Griffin.

161.    Defendants knew or should have known that the manner in which they were manufacturing, marketing, distributing and selling turnouts containing PFAS or PFAS-containing materials therein would result in harm to Decedent Griffin as a result of turnouts in the ordinary course of performing Decedent Griffin's duties as a firefighter.

162.    Defendants knew, foresaw, anticipated, and/or should have foreseen, anticipated, and/or known that the design, engineering, manufacture, fabrication, sale, release, handling, use, and/or distribution of PFAS-containing materials in turnouts, and/or Defendants' other acts and/or omissions as described in this complaint, could likely result in PFAS exposure to Decedent Griffin, the persistence and accumulation of toxic and harmful PFAS in his blood and/or body, and cause injuries to Decedent Griffin as herein alleged.

163.    Despite knowing, anticipating, and/or foreseeing the bio-persistent, bio-accumulative, toxic, and/or otherwise harmful and/or injurious nature of PFAS, Defendants, their agents, servants, and/or employees, committed negligent acts and/or omissions that resulted in PFAS exposure to Decedent Griffin by and through his foreseeable use of turnouts, the persistence and accumulation of toxic and harmful PFAS in his blood and/or body as a result, and caused injuries to Decedent Griffin as herein alleged.

164.    Defendants, through their acts and/or omissions as described in this complaint, breached their duties to Decedent Griffin.

165.    It was reasonably foreseeable to Defendants that Decedent Griffin would likely suffer the injuries and harm described in this complaint by virtue of Defendants' breach of their duty and failure to exercise ordinary care, as described herein.

166.    Defendants' acts and omissions amount to negligence, gross negligence, reckless disregard for human life and safety, and willful and wanton misconduct.

Page **51** of **54**

167.    As a direct and proximate result of the Defendants' acts and omissions, Decedent Griffin suffered the injuries and death.

168.    Defendants acted with willful or wanton conduct, or such recklessness as evinces a conscious disregard for the rights, health, and safety of others including Decedent Griffin, as described herein, thereby entitling Plaintiff Griffin to an award of punitive damages.

**PRAYER FOR RELIEF**

169.    Plaintiff incorporates by reference all allegations asserted in this Complaint.

170.    As a direct and proximate result of Decedent Griffin's wrongful death, Plaintiff suffered damages in the form of:

a.    Sorrow, mental anguish, and solace which may include society, companionship, comfort, guidance, kindly offices and advice of the decedent;

b.    Compensation for reasonably expected loss of income of Decedent Griffin;

c.    Compensation for reasonably expected services, protection, care, and assistance provided by Decedent Griffin;

d.    Expenses for the care, treatment and hospitalization of Decedent Griffin; and

e.    Reasonable funeral expenses;

f.    Punitive damages for Defendants' willful or wanton conduct, or such recklessness as evinces a conscious disregard for the safety of others.

WHEREFORE, for the foregoing reasons, Plaintiff Aimee Marie Jenkins-Griffin, Administrator of the estate of Christopher George Griffin, deceased, respectfully prays for reliefs against Defendants, jointly and severally, in the sum of SEVENTY-FIVE MILLION DOLLARS ($75,000,000.00) in compensatory damages, ONE HUNDRED FIFTY MILLION DOLLARS

($150,000,000.00) in punitive damages, the cost of this action, prejudgment interest, and any other relief this Court deems just and proper.

**TRIAL BY JURY DEMANDED**

Plaintiff hereby demands a trial with a jury on all issues in the cause, including liability and damages.

**Respectfully yours,
AIMEE MARIE JENKINS-GRIFFIN,
Administrator of the Estate of
CHRISTOPHER GRIFFIN, deceased,
Plaintiff**


s/ Kevin Biniazan
Kevin Biniazan | VSB No. 92109
Jeffrey A. Breit | VSB No. 18876
Lauren Martin | VSB No. 93653
BREIT BINIAZAN, PC
Towne Pavilion Center II
600 22nd Street, Suite 402
Virginia Beach, VA  23451
Telephone | 757.622.6000
Facsimile | 757.299.8028
Email | kevin@bbtrial.com
Email | jeffrey@bbtrial.com
Email | lmartin@bbtrial.com

*Counsel for Plaintiff*

**C E R T I F I C A T E**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will then send notification of electronic filing (NEF) to counsel of record.

Date: <u>November 20, 2024</u>

s/ Kevin Biniazan
Kevin Biniazan | VSB No. 92109
BREIT BINIAZAN, PC
Towne Pavilion Center II
600 22nd Street, Suite 402
Virginia Beach, VA  23451
Telephone | 757.622.6000
Facsimile | 757.299.8028
Email | kevin@bbtrial.com
*Counsel for Plaintiff*
